45 So.2d 610

**LIBERTY FARMS, Inc. v. MILLER et al.**

No. 39269.

Feb. 13, 1950.

Rehearing Denied March 20, 1950.

Frank W. Summers, Richard J. Putnam, Walter B. Gordy, Jr., Abbeville, for defendant-appellant Dr. Preston J. Miller.

Harold Moses, New Orleans, for defendant-appellee The Federal Intermediate Credit Bank of New Orleans.

Kibbe & Bailey, Abbeville, Monroe & Lemann, Walter J. Suthon, Jr., New Orleans, for plaintiff and appellee Liberty Farms, Inc.

McCALEB, Justice.

This case presents for determination the ownership of an undivided one-half of the minerals in and under certain lands, located in Vermillion Parish, which were acquired by defendant, Dr. Miller, from plaintiff by warranty deed on January 25th 1941. Plaintiff, as claimant of the one-half mineral interest, instituted the action for Miller's alleged slander of its title, the averments of the petition being allegedly supported by four conveyances, upon the construction of which the decision of the case depends. In addition to Miller, Federal Intermediate Credit Bank of New Orleans was joined as a party defendant. The allegations of the petition, taken in conjunction with the exhibits attached thereto, enfold the following facts and circumstances.

Plaintiff, Liberty Farms, Inc., a domestic corporation domiciled in Acadia Parish, was the owner of a number of large contiguous tracts of land in the Parish of Vermillion. Prior to 1935, the corporation was heavily indebted to Canal Bank & Trust Company of New Orleans, which went into liquidation during 1933. The Canal Bank had discounted most, if not all, of plaintiff's obligations with Federal Intermediate Credit Bank. In 1932, Canal Bank formed Vermaca, Inc., as a convenient instrumentality for managing and financing various properties which it had acquired from debtors. On October 29th 1935, Vermaca became the owner of all of the capital stock of plaintiff corporation by acquisi-

tion from the Federal Bank, where it had been held as collateral. This transfer was effected in accordance with a plan which had been formulated by the President of Vermaca (who was also a liquidator of the Canal Bank) and officials of the Federal Bank whereby all of the collateral held by the latter securing obligations of Vermaca, including the capital stock of plaintiff, was to be delivered to Vermaca in consideration of the issuance by Vermaca of five promissory notes, each for approximately $16,083, payable from one to five years after October 29th 1935, aggregating a total of $80,403.72, and the conveyance by Vermaca of a mineral servitude to the lands in Vermillion Parish owned by plaintiff, Liberty Farms, for the purpose of securing payment of the promissory notes and another indebtedness of $69,176.76. To carry out this scheme, the Federal Bank turned over to Vermaca the capital stock of plaintiff corporation and, simultaneously, plaintiff, at the instance of Vermaca and solely in order that it could furnish security to the bank, executed a deed conveying to Vermaca all of the minerals in and on the various tracts of land owned by it in Vermillion Parish for the stated consideration of the delivery by Vermaca of a mortgage note issued by plaintiff dated April 6th 1931, in the sum of $31,708.38.

Immediately thereafter, on the same date, Vermaca transferred, conveyed and assigned the mineral servitude to the Federal Bank. This contract recited in substance that, whereas the bank had released to Vermaca certain notes and other collateral for the consideration of $80,403.72, evidenced by five promissory notes executed by Vermaca and, whereas Vermaca had acquired a mineral servitude covering certain lands belonging to plaintiff, Vermaca sold and assigned with warranty of title the mineral servitude, subject to certain conditions, which may be stated as follows:

1. That the sale and assignment of the minerals would be void and of no effect "and the property herein conveyed shall revert to Grantor herein" upon payment of the five promissory notes amounting to $80,403.72 and the payment of an additional sum of $69,167.76 with 6% interest thereon from June 21st 1935 until paid "the latter sum to be paid as an additional consideration only in the event of the receipt of royalties from the exploitation of said mineral rights, and then only from one-half of the royalties derived from the exploitation thereof".

2. That all of the rents, revenues and royalties derived from the mineral servitude were to be applied by the bank to the payment of the $80,403.72 and $69,167.76 obligations in the following manner:

(a) The rentals and revenues, as distinguished from royalties, received by the bank were to be applied to payment of the $80,403.72 indebtedness until the notes were paid in full as to principal and interest and, after payment of the notes, all

the rentals would be paid by the bank to Vermaca.

(b) One-half of the royalties, as distinguished from rentals, received by the bank, was to be used in liquidation of the five notes representing the $80,403.72 obligation until paid.

(c) The remaining one-half of the royalties were to be applied to the payment of the $69,176.76 obligation until it was satisfied in full.

(d) That any revenues received from the mineral servitude would be applied first to the payment of interest and then to principal.

(e) That the Federal Bank agreed not to sell or assign the mineral servitude and that, after the liquidation of all indebtedness, it would reconvey and reassign to Vermaca the entire mineral estate; that, when the five promissory notes aggregating $80,403.72 were paid in full, the bank would convey and assign to Vermaca an undivided one-half of the mineral estate and that, thereafter, Vermaca would be entitled to receive all of the rentals and revenues, as distinguished from royalties, derived from oil leases then in existence.

(f) And, finally, that all mineral leases granted by the bank should have the approval of Vermaca, except under special circumstances.

Thereafter, on July 8th 1937, the Federal Bank and Vermaca, with the concurrence of plaintiff, leased to Humble Oil & Re-

fining Company the mineral estate conveyed on October 29th 1935. But it does not appear that the lessee ever began drilling operations.

On November 22nd 1938, the bank, Vermaca and plaintiff entered into a tri-party agreement wherein Vermaca transferred all of its right, title and interest in and to the "contract of sale and agreement which is dated October 29, 1935" for a consideration of $1000 cash. In accepting this transfer, plaintiff recognized the servitude and interest of the bank in the oil, gas and other minerals and assumed all of the obligations of Vermaca under its contract with the bank. On its part, the bank acknowledged payment by Vermaca of the promissory notes aggregating $80,403.72 and, in recognition of its obligation under the contract of October 29th 1935, sold and assigned to plaintiff, as transferee of Vermaca, an undivided one-half interest in the oil, gas and other minerals included in the servitude on plaintiff's land.

Thus, by this agreement, plaintiff became the successor of Vermaca and obtained a retransfer of one-half of the minerals thereby extinguishing, by confusion, the mineral servitude on its land to that extent.

With affairs in this state, plaintiff, on January 25th 1941, sold to Dr. Miller a portion of the lands covered by the servitude for a consideration of $27,500. This deed contained the following stipulation: "There is conveyed to the purchaser herein an undivided one-half of all the oil, gas, and other

minerals including sulphur in, on, and under the land, above described, which mineral interest was reconveyed to the vendor herein by Federal Intermediate Credit Bank on November 22, 1938, by act before K. C. Barranger, Notary Public, recorded November 29, 1938, in Vol. 140 of Conveyances, page 514, Under Entry No. 66324, records of Vermillion Parish, Louisiana, and the vendor herein reserves to itself the remaining undivided one-half of all the oil, gas and other minerals including sulphur, in, on and under said land, including the usual and incidental rights of ingress and egress, for the purpose of exploring for same."

It is alleged by plaintiff that, notwithstanding the foregoing reservation of one-half of the minerals in the act of sale, Miller is claiming that these minerals have reverted to him, as landowner, by the ten year prescription of non-user; that this contention hampers and retards it in the free exercise of the mineral interest reserved by it under the deed, constituting a cloud on its title which the court should remove by appropriate decree.

Miller appeared and interposed, in limine, an exception of no cause of action and, alternatively, pleaded estoppel. The bank, also made a defendant, answered and joined plaintiff in its contentions.

After hearing argument, the trial judge overruled the exception, assigning lengthy

reasons therefor. Miller thereupon answered reasserting the same contentions made by him on the exception and, assuming the position of plaintiff in a petitory action, maintained that he was the owner not only of the surface and one-half of the minerals (by the deed of January 25th 1941) but that the remaining one-half of the minerals have reverted to him by the prescription of ten years. After a hearing on this issue,[1] the court rendered judgment in plaintiff's favor. Miller has prosecuted this appeal from the adverse decision.

We address our immediate attention to Miller's exception of no cause of action. Plaintiff's theory of the case is that, whereas it granted a servitude to Vermaca on October 25th 1935, the simultaneous conveyance of Vermaca to the bank was a security or pignorative contract; that, notwithstanding the recital in the deed that the servitude was sold and conveyed to the bank, it was in reality a pledge or antichresis and that, this being so, Vermaca retained legal title to the servitude. From this premise, it is asserted that, by the tri-party agreement of November 22nd 1938, plaintiff acquired title to the servitude from Vermaca (also presumably in part from the bank by its transfer of an undivided one-half interest in the minerals); that thereafter, when it conveyed to Miller, it was vested with the ownership of the entire mineral interest, subject only to the

---

1. The hearing on the merits was practically a reiteration of the exception of no cause of action, as no evidence was adduced to contradict any of the well-pleaded facts contained in the petition.

bank's right as pledgee, and that, consequently, it had the legal right to reserve to and for itself one-half of said minerals.

In the alternative, plaintiff contends that, if it is held that the bank acquired the mineral servitude from Vermaca on October 29th 1935, the reservation by it in its deed to Miller is nevertheless valid and that, when the bank's mineral servitude was extinguished by prescription on October 29th 1945, it and not Miller was entitled to benefit by the extinction of said servitude. Again, in the alternative, plaintiff maintains that, should it be determined that the bank acquired ownership of the servitude, prescription was interrupted by its (plaintiff's) acknowledgment and recognition of that servitude in the act executed and recorded in 1938.

■ We immediately eliminate from the discussion, as not well founded, plaintiff's first alternative contention that, even though the bank is held to have acquired title to the servitude from Vermaca, it would nevertheless be entitled to reserve one-half of the minerals in its conveyance to Miller in 1941. One may not reserve reversionary rights to minerals when he is not the owner of the minerals at the time the reservation is made. It is settled that, in such instances, the reservation is ineffective and the outstanding mineral interests revert to the person owning the land at the time prescription accrues. McDonald v. Richard, 203 La. 155, 13 So.2d 712; Gulf Refining Co. v. Orr, 207 La. 915, 22 So.2d 269 and Long-Bell Petroleum Co. Inc. v. Tritico (on rehearing), 216 La. 426, 43 So.2d 782.

■ In view of the above cited authorities, plaintiff cannot succeed in obtaining judicial recognition of its reservation of one-half interest in the minerals unless it is able to sustain its main contention that the transfer by Vermaca to the bank is an antichresis. In their efforts to demonstrate that title to the servitude did not pass to the bank in the agreement of October 29th 1935, wherein it was specifically recited that Vermaca assigns, grants, sells and conveys "All of the oil, gas and other minerals and mineral estate, * * * to the following described tracts of land * * * ", counsel for plaintiff depend primarily upon the well-established rule of law that, in determining the nature of a transaction, the court will look to the substance rather than to the mere terms used to describe it. Long v. Sun Co. 132 La. 601, 61 So. 684 and Grapico Bottling Works v. Liquid Carbonic Co., 163 La. 1057, 113 So. 454. And it is said that an examination of the nature of the agreement between Vermaca and the bank readily discloses that the servitude was conveyed solely as security for Vermaca's debt and that the transaction bears no resemblance to a sale, exchange or other similar contract known to our law.

We are in accord with counsel that the conditions set forth in the agreement by which the bank acquired title from Vermaca make it manifest that it was not an outright sale or even a sale with the right of redemp-

tion. In truth, it was nothing more than a conveyance to the bank of a security title in the sense that the bank hoped to obtain out of mineral leases, rents and royalties a sufficient amount to liquidate in full the $80,403.72 indebtedness represented by the notes of Vermaca and, out of royalties, satisfaction of the contingent indebtedness of $69,176.76.

But this fact does not make imperative a holding that title did not pass to the bank. Particularly is this so when it is evident from the nature of the transaction that it cannot be classified as an antichresis which, under our law, is a pledge of an immovable. Article 3135, Civil Code. While the agreement between Vermaca and the bank contains one of the main characteristics of an antichresis, in that the servitude was conveyed for security purposes, the servitude could not form the basis of a valid pledge as it was not susceptible of either real or fictitious and symbolical delivery. Article 3152 of the Civil Code provides: "It is essential to the contract of pledge that the creditor be put in possession of the thing given to him in pledge, and consequently that actual delivery of it be made to him, unless he has possession of it already by some other right."

And Article 3153 declares: "But this delivery is only necessary with respect to corporeal things; as to incorporeal rights, such

as credits, which are given in pledge, the delivery is merely fictitious and symbolical."

It is clear from the foregoing that plaintiff must depend on Article 3153 as servitudes are not susceptible of real delivery; it is the use the owner makes of the right which supplies the place of delivery. Article 743, Civil Code. But counsel for plaintiff contend that, since the servitude is an incorporeal immovable,[2] no delivery whatever is essential and that a valid antichresis may be perfected by mere agreement because, under Article 3153, the delivery is a fiction.

Article 3153 eliminates the requirement of a real delivery when the thing given in pledge is an incorporeal right. The reason for this is obviously because it is impossible to make a real delivery of an incorporeal right. But the article does not dispense with a delivery. It requires that there must be something substituted as a symbol in the place and stead of actual and real delivery. The provision that delivery is merely fictitious and symbolic does not mean that a valid pledge or antichresis may be effectuated where there is nothing which can be placed in the pledgee's possession capable of standing in lieu of the right sought to be pledged. For example, shares of stock in a corporation may be pledged by delivery of the stock certificate evidencing the interest in the corporation. But we se-

---

2. Articles 470, 471, Civil Code; Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229; Arent v. Hunter, 171 La. 1059, 133 So. 157; Patton's Heirs. v. Moseley, 186 La. 1088, 173 So. 772 and Deas v. Lane, 202 La. 933, 13 So.2d 270.

riously doubt that a servitude may be the subject of an antichresis—for, without delivery to the pledgee of legal title, there is no way by which he can become vested with the right of its use.

In our research, we have been unable to find any case in this State involving the pledge of a servitude and we have been referred to none by counsel. However, Professor Denis, on page 26 of his treatise "Contract of Pledge", declares: "Inasmuch as possession is the essential element of a pledge, what can not be delivered, either actually or constructively, can not be pledged, even if it can be sold."

Thus, it would seem that a right such as a servitude could not be given in pledge without the transfer of title from the debtor to the creditor. Provision is made under our law for such a transfer by an assignment. Article 2642 of the Code declares that, in the transfer of credits, rights or claims to a third person, "the delivery takes place between the transferrer and transferee by the giving of the title." This is exactly what is provided for in the agreement between Vermaca and the bank. True, the servitude was conveyed for security purposes but title was nonetheless delivered. Therefore, it could not, strictly speaking, be a pledge.

Our resolution that the transaction was the assignment of a security title to the bank by Vermaca is supported by the deci-

sion of this Court in Caffin v. Kirwan, 1852, 7 La.Ann. 221. In that matter, the question for decision was whether the rights of a lessee under a lease could form the subject of a valid pledge. In holding that it could not, the court said that only things, whether corporeal or incorporeal, susceptible of delivery, actual, fictitious or symbolical, can be pledged. In concluding thus, the Court adopted with approval the opinion of the trial judge, wherein it is observed: "I believe a legal delivery might have been effected by an instrument in the form of a sale or transfer, of all Kirwan's right to Caffin for the avowed purpose of securing him by way of pledge, accompanied by a notice to Kirwan's lessor. This would have vested the legal title into the pledge. Every day our courts give the effect of a mortgage to contracts of this description passed in other States. But, one thing appears to me certain, namely: that if the delivery of rights under a lease cannot be effected in this manner, it cannot be effected at all, and consequently that such rights cannot be pledged by our law."

A fortiori, this pronouncement applies to a servitude—for, since a servitude is not susceptible of delivery but only of use, Art. 743, Civil Code, a transferee without title would have nothing with which to demand recognition of his right of use from the owner of the land on which the servitude was established.[3]

---

3. By Act No. 97 of 1938, the Legislature provided for the pledging of rents, royalties, overriding royalties, bonuses and other payments and rights accruing under mineral leases and other contracts relating to minerals without any delivery of

Aside from everything else, there is another flaw in plaintiff's contention which plainly appears on analysis. In order to maintain its position, counsel assert that, when Vermaca transferred to plaintiff, under the 1938 tri-party agreement, its interest in the 1935 contract with the bank, plaintiff obtained title to the servitude subject to the pledge of the bank. But, in arguing thus, counsel neglect to consider the legal effect which would be produced by plaintiff's acquisition of title to the mineral servitude while it was owner of the land subjected thereto. Indeed, if plaintiff's contention were upheld, then the servitude would be extinguished by confusion. Article 783, Civil Code; Sample v. Whitaker, 171 La. 949, 132 So. 511 and Arent v. Hunter, 171 La. 1059, 133 So. 157. And, if the servitude was extinguished in 1938, the bank could not hold it in pledge as there was no servitude. Accordingly, the argument that the 1935 transfer of Vermaca to the bank did not vest the latter with legal title to the servitude inevitably leads to the unseemly consequence that the bank had a pledge on a non-existent incorporeal right.

■ The conclusion we have reached leaves only for discussion plaintiff's second alternative proposition that its acknowledgment in 1938 that the bank was vested with

a servitude for one-half of the minerals had the effect of interrupting the running of prescription.[4] It is stated in the 1938 tri-party agreement that plaintiff "hereby acknowledges and recognizes the servitudes and/or interest of the bank in and to all of the oil, gas, and other minerals and mineral estate, rights, and servitudes on, in, under and to the hereinabove described property and assumes all obligations of Vermaca under its contract with the Bank; * * *".

■ The foregoing acknowledgment falls far short of the type required to effect an interruption of the running of prescription. In the case of Hightower v. Maritzky, 194 La. 998, 195 So. 518, 521, we observed: "In order for an acknowledgment by a landowner that his land is subject to certain mineral rights in favor of a person named in the acknowledgment to have the effect of interrupting the prescription by which such rights are extinguished the intention that the acknowledgment shall have that effect must be expressed in unmistakable terms." See also Achee v. Caillouet, 197 La. 313, 1 So.2d 530 and Baker v. Wilder, 204 La. 759, 16 So.2d 346.

We are of the opinion that the exception of no cause of action is well founded and should have been sustained.

the pledged rights. The act is without application to the instant case as the alleged antichresis was confected in 1935, prior to its passage. Hence, it is unnecessary to determine whether mineral servitudes are included within the provisions of the law.

4. It is admitted that there has been no interruption by use of the servitude for over ten years from its creation in 1935.

Accordingly, the judgment appealed from is reversed; the exception of no cause of action is maintained and plaintiff's suit is dismissed at its cost.

HAMITER, J., concurs.