245 F.2d 943
 Garvis I. BAZEMORE, C. T. Ruffin and Goodwyn H. Harris, Jr., Appellants,
v.
Harmon WHITTINGTON, Charles F. Reed and W. Paul Edman, d/b/a Mid-Century Oil & Gas Company and A. B. Dow, Appellees.
 No. 16064.
 United States Court of Appeals Fifth Circuit.
 June 10, 1957.
 Rehearing Denied July 31, 1957.
 
 Gordon B. Golsan, Jr., Howard E. Spann, Craig, Magee & Spann, Mansfield, La., for appellants.
 W. M. Phillips, Marlin Risinger, Jr., W. S. Waller, Shreveport, La., for appellees.
 Before RIVES, TUTTLE and BROWN, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 The contention, pressed successfully by plaintiff-appellee Edman and his other Texas associates trading as Mid-Century Oil & Gas Company, was whether, through the operation of the doctrine[1] of after-acquired title, Edman, by a 1951 assignment to him of an earlier (1947) oil and gas lease obtained a lease of the whole rather than one-half of the minerals because, subsequent to the assignment, an outstanding reservation of one-half of the minerals prescribed for non-user. Reaching this result, the District Court rejected the basic defense made there and here by defendant-appellants that the Louisiana policy forbidding[2] a conveyance of an anticipatory reversion through operation of the liberative prescription would prevent the accomplishment of the same result through the indirect means of the equitable doctrine of after-acquired title. Rejected also was the subsidiary point that the assignment to Edman if properly construed was for a half only so that Edman got exactly what he bought.
 
 
 2
 We are all in agreement on the basic facts. The chain of title starts here with Keatchie Investment Corporation, the uncontradicted actual and record owner of the full estate in 1941. On October 27, 1941, Keatchie conveyed the whole (127 acres) to Bazemore reserving, however, one-half of the minerals. This mineral servitude, United States v. Nebo Oil Co., supra, 190 F.2d at page 1007, would prescribe for non-user October 27, 1951, and would normally "revert" to Bazemore on that date. On March 11, 1947, Keatchie for an express cash bonus of $127.00 executed a standard (Bath's spec 14-BR 1) oil and gas lease for a ten-year primary term to Robertson Stores, Inc.,[3] an Arkansas corporation, covering, "* * * the following described[4] land in DeSoto Parish * * *," and then stated expressly, "For all purposes of this lease the described premises shall be treated as comprising 127 acres, whether there be more or less." Keatchie expressly warranted[5] full ownership.
 
 
 3
 May 1, 1947, by an identical printed form[6] but for a cash bonus of $317.00, Robertson Stores, Inc., the common grantee, obtained from Bazemore a 10-year lease with like statements and warranties for the same 127 acres.
 
 
 4
 At that time, of course, Bazemore owned only one-half of the minerals. It is this lease, with its unlimited warranty purporting to convey all which, after a succession[7] of conveyances expressly covering both halves, was assigned to Edman as to the Bazemore lease only and which is at the bottom of Edman's claim that the half interest expanded a few months later into a full lease when the Keatchie reservation of the mineral servitude prescribed October 27, 1951.
 
 
 5
 Thus the title stood when, April 16, 1951, Edman obtained from Robertson Oil Company, Inc., an assignment (without express warranty) of many leases covering:
 
 
 6
 "All of its right, title and interest in and to all of the following described oil, gas and mineral leases covering lands situated in DeSoto Parish, Louisiana, to-wit: * * *"
 
 
 7
 but carefully limiting the description to the Bazemore lease (note 6, supra):
 
 
 8
 "10. Lease executed by Garvis I. Bazemore in favor of Robertson Stores, Inc., dated May 1st, 1947, recorded under Registry Number 186618, Conveyance Records of DeSoto Parish, Louisiana, which covers and affects an undivided one-half interest in [here follows metes and bounds, note 6, supra] * * * the 127 acres involved.
 
 
 9
 By construing the phrase "* * which covers and affects an undivided one-half interest" in the lease as describing merely the present state of the title, the District Court concluded that the assignment covered a lease of the whole, not half. That being so, when the Keatchie one-half reverted to Bazemore by prescription October 27, 1951, application of the doctrine of after-acquired title would effectuate a full conveyance.
 
 
 10
 Judges RIVES and TUTTLE agree with the District Court on this construction and do not concur in the following exposition of the views by Judge BROWN in support of his contrary conclusion with which they disagree.
 
 
 11
 This construction of the District Court, especially in the light of the Conveyance Record, note 7, supra, McDuffie v. Walker, 125 La. 167, 51 So. 100; Cole v. Richmond, 156 La. 262, 100 So. 419, and without which Edman would not have the opportunity of seeking the benefit of the warranties in the Bazemore 1947 lease, seems clearly incorrect. First, if the present tense is significant in the description of the existing state of the title of the lease conveyed, it is equally plausible that the granting clause, "* * has bargained, sold, transferred, assigned and conveyed, and by these presents does bargain, sell, transfer, assign and convey * * * all of its right, title and interest * * *" speaks likewise in the present. The assignment, without express warranties, in terms of "all of its right, title and interest" [133 F.Supp. 165.] indicates a purpose to convey what it then owned, Waterman v. Tidewater Associated Oil Co., supra, and note 7, supra, and not a purpose to convey that which was not then owned but which might[8] thereafter accrue.
 
 
 12
 And from Edman's point of view, to particularize with care the one specific lease (Bazemore) when the entire chain of title showed that the common grantee (Robertson Stores, Inc.) and all of its successors considered[9] that a full lease was obtained only by specific assignments of both the Bazemore and Keatchie leases, reflects a purpose to acquire one but not the other. Had it seriously been the intention[10] to obtain the lease of the whole (not half), Edman, as had all of his predecessors, would have insisted that the assignment expressly describe both leases. But instead of doing this, Edman referred to one only, and then made the expectation doubly clear by correctly characterizing the lease thus incorporated by reference as "* * * an undivided one half interest in" the leasehold estate. Why Edman carefully chose to accept one and not require the other does not appear. Had he, as his predecessors, required that both be expressly mentioned, it was obvious that one-half of the lease would likely fail when Keatchie's servitude prescribed a few months hence. Perhaps it was because of this that he felt the short time left would not justify cost or expense.
 
 
 13
 And it strains language in this setting to think that through a phrase as equivocal as "which covers and affects" it was the expectation that, mentioning the Bazemore lease alone and omitting all reference to the Keatchie lease, he would actually get more than had he specified both. If Edman's probable answer to this is the suggestion that reference was deliberately restricted to one (Bazemore) and the exclusion of the other (Keatchie) because a skilled title examiner could see that after-acquired title would give more than an express conveyance of both, then a proper regard for the original 1947 warranties further demonstrates that Edman neither obtained an additional title nor was it intended that he should.
 
 
 14
 This analysis proceeds on the premise that the doctrine of after-acquired title is an importation of non-Codal equitable concepts to effectuate the warranties[11] imposed by the Louisiana Code. And if, on this title record, Robertson Stores, Inc., had no real enforceable rights of recovery against Bazemore on the 1947 warranties, Edman acquired none by subrogation to the rights of Robertson Stores, Inc.
 
 
 15
 While the warranty was unqualified and the lease purported to cover the whole[12] (not one-half), Robertson Stores, Inc., as the common grantee from the two admitted, sole owners of the minerals, had no enforceable recoveries against Bazemore had it, for example, in 1948 or 1949 sued him on the warranties. Robertson Stores, Inc., by the prior Keatchie lease, knowing the state of the title and, indeed, in a position where, absent an eviction, it could not dispute or deny its lessor's (Keatchie's) title, Sabine Lumber Co. v. Broderick, 5 Cir., 88 F.2d 586, 588, certiorari denied 302 U.S. 711, 58 S.Ct. 31, 82 L.Ed. 549 and see extensive citations Art. 2710 of the Louisiana Civil Code Annotated, LSA-C.C., under headings 15, 18, was aware of the "defect" in its vendor's (Bazemore's) title and consequently could not recover damages,[13] as such.
 
 
 16
 It could not rescind the purchase since, having itself just previously obtained a ten-year lease from the uncontradicted owner of one-half of the minerals, it could not, as required by Art. 2511 of the Code, show that the transaction with Bazemore was made on the expectation that he owned all and would not have been entered into at all had Bazemore not "misrepresented" the extent of his title.[14] Nor, for the same reasons, after failing to satisfy Article 2511, could it have met the implications[15] of Article 2514 that, while it would yet have been willing in effect to consummate the transaction had the fact of a lesser title been known, the purchase price would have been less[16] and should hence be reimbursed "proportionably."
 
 
 17
 Nor, unable to recover damages, the whole or part of the purchase price or rescind, would it have fared any better on the claim of eviction. For here, the warrantor is liable for a constructive eviction only when there is a perfect title outstanding in a third person at the time of the sale.[17] After these two transactions with Keatchie and Bazemore, the half which Bazemore theoretically "sold" and warranted but which he did not own was not in a third person — it was in Robertson Stores, Inc., itself. Bazemore's defense on the warranty would have been absolute for his reply would simply have been: the title is not outstanding in a third person; it is complete in Robertson Stores, Inc.
 
 
 18
 The only "defect" in title which Robertson Stores, Inc., could then assert was that, having taken a ten-year lease on one-half of the minerals from Keatchie whose servitude might prescribe within approximately four years (March 11, 1947 to October 27, 1951), the intent of Bazemore's unconditional lease was to "sell" to Robertson Stores, Inc., Bazemore's reversion. But this was an agreement which Louisiana holds is not to be implied, and which, if expressed, is forbidden as an obvious means of defeating its Codal public policy of liberative prescription, see note 2, supra.
 
 
 19
 Of course, after-acquired title may serve to effectuate a title which a purported sale of the possibility of reverter could not accomplish, White v. Hodges, 201 La. 1, 9 So.2d 433; McDonald v. Richard, supra; Bates v. Monzingo, 221 La. 479, 59 So.2d 693. But these cases all involve the purported conveyance of a title which neither the vendor nor purchaser had and which was in fact outstanding in third parties. They do not attempt to cover transactions in which the purchaser actually had the full title which the vendor apparently warranted. Indeed, distinguishing those specific cases for this very reason that, "In none did the same party, as here, purchase identical minerals; in each the purchase was by a third party", the Supreme Court of Louisiana, Long-Bell Lumber Co. v. Granger, 222 La. 670, 63 So.2d 420, 422, refuses to contrive a theoretical oversale to one who got or had all as a further basis for asserting a reversion on which, as the last step, to rest a claim of after-acquired title. The Court holds[18] that a deed covering all granted to one who then owns all is meaningless despite its literal terms. By the same token, Bazemore's deed apparently covering the whole was, despite its terms, meaningless to the extent that it covered more than one-half for Robertson Stores, Inc. then owned one-half and could not buy more than the other half.
 
 
 20
 On this analysis, in Judge BROWN'S view, the whole theory of Edman's claim collapses.
 
 
 21
 But while we are not in agreement on the construction of the Edman assignment, we are unanimous in the view that it amounted to nothing more than a quitclaim deed which the Supreme Court of Louisiana plainly holds, Waterman v. Tidewater Associated Oil Company, 213 La. 588, 35 So.2d 225, as do other jurisdictions (see note 7, supra), will not here support after-acquired title. Because of this, the summary judgment in Edman's favor was clearly wrong, and the cause must be reversed and judgment rendered on defendants'-appellants' motion for summary judgment.[19]
 
 
 22
 Reversed and rendered.
 
 
 
 Notes:
 
 
 [1]
 See Lum Chow v. Board of Commissioners for Lafourche Levee District, 203 La. 268, 13 So.2d 857; Brady v. Falgout, D.C.La., 42 F.Supp. 532; Angichiodo v. Cerami, D.C.La., 35 F.Supp. 359, affirmed 5 Cir., 127 F.2d 848. Concerning mineral interests see St. Landry Oil & Gas Company v. Neal, 166 La. 799, 118 So. 24; Gayoso Company v. Arkansas Natural Gas Corporation, 176 La. 333, 145 So. 677. So far as the disposition of this case is concerned, we are in substantial agreement on the applicability of the doctrine of after-acquired title to mineral leases. Judge RIVES and TUTTLE conclude that it is. Judge BROWN assumes itarguendo, but doubts that our positiveness should exceed that of the author whose last expression repeats again some earlier reservations, Long-Bell Lumber Co. v. Granger, 222 La. 670, 63 So.2d 420.
 
 
 [2]
 See Liberty Farms, Inc. v. Miller, 216 La. 1023, 45 So.2d 610; McDonald v. Richard, 203 La. 155, 13 So.2d 712; White v. Hodges, 201 La. 1, 9 So.2d 433; McMurrey v. Gray, 216 La. 904, 45 So.2d 73; Gulf Refining Company v. Orr, 207 La. 915, 22 So.2d 269; Hicks v. Clark, 225 La. 133, 72 So.2d 322; Gailey v. McFarlain, 194 La. 150, 193 So. 570. The suggestion from language of the earlier cases resting decision on the construction of the instruments that thepossibility of reverter could be conveyed if intent were expressly uncontradicted seems put to rest by Liberty Farms, Inc. v. Miller, 216 La. 1023, 45 So.2d 610, and Hicks v. Clark, 225 La. 133, 72 So.2d 322, 324:
 "* * * One may not reserve reversionary rights to minerals when he is not the owner of the minerals at the time the reservation is made. It is settled that, in such instances, the reservation is ineffective and the outstanding mineral interests revert to the person owning the land at the time prescription accrues. * * * We consider the reservation of the reversionary interest in this case as an effort to circumvent the public policy of this state, and we therefore refuse to recognize or give effect to it * * *."
 Nabors, The Louisiana Mineral Servitude and Royalty Doctrines: A Report To the Mineral Law Committee Of The Louisiana State Law Institute, 25 Tulane Law Review 183, indicates that Liberty Farms v. Miller has closed the door as, "* * * the pronouncement that reversionary interests are unauthorized which was made in Liberty Farms v. Miller indicates that unambiguous contracts relative to reversionary interests will not be recognized." Approved United States v. Nebo Oil Co., 5 Cir., 190 F.2d 1003.
 With the inveterate tenacity of the advocate, Sachse, The Validity of Clause Purporting to Bind After Acquisitions of Lessor, Second Annual Institute on Mineral Law (1954) 118-130; as does Schoenberger, Problems Arising From Mineral Reservations and Sales, First Annual Institute (1953), p. 25 at p. 36, indicate some leeway may still be open for, "* * * in spite of the language * * * from the Liberty Farms case, this remains a problem, and there remains a possibility that the reversionary rights might be reserved with a properly worded reservation tailored to the opinions in those cases"; but at this stage, this is the advocate's hope for "From this it is manifest that we will continue to have problems as long as we have minerals and as long as we have industrious ingenious lawyers. Heaven forbid that we run out of either for a long time to come."
 
 
 [3]
 The named grantee was T. E. Robertson, but recorded in the Conveyance Records was the express acknowledgment by the Corporation that all purchases of lands, mineral interests, etc., whether made in the name of Robertson or the Corporation were for the benefit of the Corporation. By a series of recorded conveyances between then and 1951, the Corporation, with no conveyance into it from T. E. Robertson, conveyed this leasehold interest by specific reference
 
 
 [4]
 The metes and bounds, identical with the Keatchie 1941 deed into Bazemore, was:
 "The Southeast quarter of the Northeast quarter and the Northeast quarter of the Southeast quarter of Section 32, Township 14 North, Range 15 West, less that portion lying west of the Keatchie-Logansport State Highway, there being excepted thirty-three (33) acres, more or less.
 "Also the North Half of the Southwest quarter of Section 33, Township 14 North, Range 15 West, containing in all 127 acres, more or less."
 This was Instrument No. 183012 and recorded Conveyance Book 169, page 323, DeSoto Parish.
 
 
 [5]
 "Lessor hereby warrants and agrees to defend the title to said land and agrees that lessee at its option may discharge any tax, mortgage or other lien upon said land and in event lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of lessee's rights under the warranty in event of failure of title, it is agreed that if lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid lessor shall be reduced proportionately."
 
 
 [6]
 The metes and bounds with but slight, formal variation from the Keatchie lease (note 4, supra) is set forth since both are expressly included in every conveyance out of Robertson Stores, Inc. and its successors except the assignment into Edman of April 16, 1951:
 "Southeast quarter of Northeast quarter, Northeast quarter of Southeast quarter of Section 32, less that portion thereof lying West of the Keatchie-Logansport Highway, the expected portion being approximately 33 acres, and the North Half of Southwest quarter of Section 33, all in Township 14 North, Range 15 West, DeSoto Parish, Louisiana"
 This was Instrument No. 186618 and recorded Conveyance Book 173, page 199, DeSoto Parish.
 
 
 [7]
 Robertson Stores, Inc., reserving an override, in one instrument (dated October 11, 1947, recorded May 18, 1948) assigned both Keatchie and Bazemore leases to Sugar Field Oil Company, Inc.; each lease was described under a separate numbered item and specifically referred to date and Registry Number (notes 4 and 6, supra), and in each case after the prefatory phrase "which covers and affects" followed it with the metes and bounds description of the original leases (notes 4 and 6, supra). All subsequent conveyances were in substantially this same form. Sugar Field reconveyed the whole of both to Robertson Stores, Inc., June 4, 1948, recorded June 7, 1948; thereafter, June 21, 1948, a 1/16 of 7/8 overriding royalty in both leases was assigned by Robertson Stores, Inc., to Earle Johnson and, through him and his successors of part interests, into Potter Oil Company August 26, 1948. August 26, 1948, recorded August 28, 1948, Robertson Stores, Inc., joined by Johnson, conveyed under general warranty both leases to Potter Oils, Incorporated, so Potter became the owner of both leases and hence owner of the full 7/8 lease. September 3, 1948, recorded September 13, 1948, Potter conveyed under full warranty an undivided one-half interest in both leases to Louis C. Blendermann; and May 5, 1949 (recorded September 15, 1950) Potter conveyed "but without covenant or warranty express or implied" all "its right, title and interest" in these two leases to Robertson Oil Company, Inc. (the relationship between it and Robertson Stores, Inc., does not appear of record). At that stage one-half was in Blendermann and one-half in Robertson Oil Company, Inc. On April 10, 1951 (recorded April 14, 1951) Blendermann "quitclaimed without any warranty whatsoever" to Robertson Oil Company, Inc. "all of his right, title and interest in and to" the two leases. With or without the word "quitclaimed" this meets the Louisiana standard for a quitclaim since "* * * Louisiana Courts have been consistent in treating a sale of right, title and interest, without warranty, as a quitclaim deed — a position which is in accord with the majority of common law jurisdictions * * *," The Legal Effect of Quit Claim Deeds in Louisiana, 23 Tulane Law Review 533, 534 (characterized by Nabors, note 2, supra, 25 Tulane Law Review 163, as "excellent treatment"). And, as discussed infra under Waterman v. Tidewater Associated Oil Co., 213 La. 588, 35 So.2d 225, a quitclaim cuts off the doctrine of after-acquired title
 
 
 [8]
 As Nabors, supra, 25 Tulane Law Review at 183, 184, points out, "The fortuitous nature of the rights which an over-sale of minerals vests in the purchaser is illustrated by McDonald v. Richard * * *." So, even on Edman's theory, there would have been no after-acquired title to inure to Robertson Stores, Inc., or its successors if Bazemore had sold the land to a third party, McDonald v. Richard, supra; or, by appropriate acknowledgment of the outstanding Keatchie servitude and lease, had suspended, interrupted or extended the prescription of non-user under Art. 3520 of the LSA-Civ.Code: "Prescription ceases likewise to run whenever the debtor, or possessor, makes acknowledgment of the right of the person whose title they prescribe." See, e. g., Frost Lumber Industries v. Union Power Co., 182 La. 439, 162 So. 37; Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., 149 La. 100, 88 So. 723; Long-Bell Petroleum Company v. Tritico, 216 La. 426, 43 So.2d 782; and Walker, Trends in the Louisiana Law of Oil and Gas, Institute on Mineral Law 1953, pages 37, 43-50, discussing these and other cases in the development of the acknowledgment-intention theory under Art. 3520 of the Code; also, Problems Arising From Mineral Reservations and Sales, Schoenberger, supra, page 25 at 28-30; Achee v. Caillouet, 197 La. 313, 1 So.2d 530; and see the extended treatment of this subject, Nabors, supra, 25 Tulane Law Review 304 to 322; and Daggett, Mineral Rights in Louisiana, pages 65-95
 
 
 [9]
 District Court's opinion points out the uncontradicted fact that delay rentals for 1948, 1949 and 1950 under the Bazemore lease were paid and accepted in the sum of $63.50 (i. e., one-half of $1.00 per acre for 127 acres)
 
 
 [10]
 The interpretation of the assignment is judged, of course, from its terms in the context of the public record for Defendants-Appellants Ruffin and Harris, when they obtained a lease from Bazemore on February 5, 1955, covering an undivided one-half mineral interest, were, as innocent purchasers, likewise entitled to rely upon the Conveyance Records, McDuffie v. Walker, supra
 
 
 [11]
 The Legal Effect of Quit Claim Deeds in Louisiana, note 7, supra, 23 Tulane Law Review 533, 541: "The doctrine is a jurisprudential development and has no basis in the Code. It finds its basis in the development of the jurisprudence concerning actions of warranty and appears to have developed as a method of enforcing the vendor's warranty without resorting to a suit." Cited is Childs v. United States, 5 Cir., 5 F.2d 816, 818
 
 
 [12]
 Some apparently consider this the preferred practice, see, Sachse, supra, at pages 125, 126, 129
 
 
 [13]
 Art. 2452 of the Code:
 "The sale of a thing belonging to another person is null; it may give rise to damages, when the buyer knew not that the thing belonged to another person"
 is read into the warranties. Baldwin, Warranty Against Eviction In the Civil Law: Extent of The Vendee's Recovery, 23 Tulane Law Review 140, 148 (cited, with Boudreaux, by Nabors, supra, 25 Tulane Law Review 163 note 101):
 "The Louisiana Code articles on warranty against eviction do not require that the vendee have been in good faith in order for him to recover damages when he is evicted. The courts have taken the requirement of good faith from Article 2452, which corresponds to Article 1599 of the French Civil Code, and applied it to evictions. Such an application appears to be valid in as much as the sale of a thing belonging to another is so closely linked to the warranties against eviction that it would be illogical to require the vendee to have been in good faith in the former case and not require it in the latter."
 And, similar, Boudreaux, Warranty Against Eviction in the Civil Law: Limitations On the Extent of the Vendee's Recovery, 23 Tulane Law Review 154 at 169.
 
 
 [14]
 Art. 2511: "If the buyer be evicted from a part only of the thing sold, and it be of such consequence relatively to the whole, that the buyer would not have purchased it without the part from which he is evicted, he may have the sale cancelled." Baldwin, supra, 23 Tulane Law Review at 152: "* * * The option of having the sale rescinded is given to the vendee by Article 2511, but in order to exercise the option he must show that he would not have purchased the property without the part from which he has been evicted."
 And, of course, rescission as a vicarious basis here for after-acquired title fails since, as he points out, "A vendee who rescinds a sale because of partial eviction must return the remainder of the property. It follows that, if the vendee has sold a portion of the property [see conveyances by Robertson Stores, Inc., note 7, supra], he cannot ask for recission of the original sale."
 
 
 [15]
 Art. 2514: "If in case of eviction from a part of the thing, the sale is not cancelled, the value of the part from which he is evicted, is to be reimbursed to the buyer according to its estimation, proportionably to the total price of sale."
 
 
 [16]
 Actually, of course, the Conveyance Record shows that, on taking the lease from Bazemore after first getting at least a half from Keatchie, the bonus was $317.00 in contrast to $127.00. And, of course, no one has ever sought reimbursement of the whole or any part of that sum
 
 
 [17]
 Baldwin, supra, 23 Tulane Law Review 140: "The sale of property in a civil law jurisdiction carries with it an implied warranty that the vendee will not be evicted from the property for any cause which existed at the time of the sale."
 Article 2500: "Eviction is the loss suffered by the buyer of the totality of the thing sold, or of a part thereof, occasioned by the right or claims of a third person."
 Article 2502: "That the warranty should have existence, it is necessary that the right of the person evicting shall have existed before the sale. * * *"
 A perfect title in a third person other than vendor amounts to eviction of the purchaser, see, e. g., Bickham v. Kelly, 162 La. 421, 110 So. 637; Robbins v. Martin, 43 La.Ann. 488, 9 So. 108; Deas v. Lane, 202 La. 933, 13 So.2d 270; Greer v. Sumney, La.App., 41 So.2d 526; Tennent v. Caffery, 163 La. 976, 113 So. 167.
 
 
 [18]
 "Clearly the doctrine of after acquired title cannot be applied to the 1936 mineral deed, even assuming that it is applicable to mineral sales in some instances. When the deed was executed Petroleum Company, the grantee, was already the owner of all of the minerals purportedly transferred, it having acquired them under the 1931 sale; and, being the owner, its purchasing them again was legally impossible. As said in LSA-Civil Code, Article 2443, `He who is already the owner of a thing, can not validly purchase it. If he buys it through error, thinking it the property of another, the act is null, and the price must be restored to him'."
 
 
 [19]
 The District Court's first opinion states: "Defendants, for their part, have moved to dismiss for failure to state a claim upon which relief can be granted, and for summary judgment. Since the greater includes the lessor, and the parties have stipulated that we may consider as undisputed all of the facts outlined above, we shall treat the matter as if presented only for summary judgment." [133 F.Supp. 166.]
 
 
 
 23
 TUTTLE, Circuit Judge (concurring specially).
 
 
 24
 My concurrence in the reversal of the trial court is based solely on the ground that the assignment to Edman was by quitclaim: in form it transferred merely "all" the assignor's "right, title and interest," thus using the customary wording of a quitclaim transfer; in addition the assignment contained no express warranties. The Supreme Court of Louisiana has held, in Waterman v. Tidewater Associated Oil Co., 213 La. 588, 35 So.2d 225, that a quitclaim deed will not, in general, support after acquired title; this is in accord with the law in other American jurisdictions, 16 Am.Jur., Deeds §§ 344-345; 31 C.J.S. Estoppel §§ 22, 30.
 
 
 25
 Edman, who does not even assert that the assignment to him was warranted, seeks, however, to rely on the warranties contained in the lease that was assigned to him. But, since it is clear from the Waterman case that even if Edman's assignor had been the owner of the land with only the mineral interest outstanding in another, the premature assignment of that interest by quitclaim to Edman would avail him nothing, even after the original interest prescribed. A fortiori, if the only interest that the Robertson Oil Corporation had in the minerals was the possibility of benefiting from the prescription if Bazemore happened to retain his title to the property until that event occurred, Edman can receive no greater benefit from the quitclaim "assignment" of the rights under the warranty than he could have had from the assignment of the mineral interest itself. In other words, the "possibility of benefiting from a prescription by means of after acquired title" is not a right, title, or interest assignable by quitclaim deed.