16 So.2d 346

BAKER v. WILDER et al.

No. 37006.

Dec. 13, 1943.

Meadors & Gensler and W. M. Shaw, both of Homer, and Jean Craighead Shaw, of Athens, for plaintiff.

F. Leonard Hargrove and Harvey L. Strayhan, both of Shreveport, for defendants.

ODOM, Justice.

On December 3, 1928, J. B. Baker, who owned a tract of land in Claiborne Parish, sold to H. J. Wilder "One-half (1/2) of the oil, gas and other minerals, in and under and that may be produced from" the tract of land.

On December 11, 1928, Wilder sold to G. G. Nesbitt "One-fourth (1/4) of the oil, gas and other minerals, in and under and that may be produced from" the same tract of land. Shortly thereafter, G. G. Nesbitt sold to R. W. Norton 3/16 of the minerals which he had acquired from Wilder, and later sold to G. G. Nesbitt, Jr., his remaining 1/16 interest in said minerals. When R. W. Norton acquired an interest in the minerals from Nesbitt, he was married and was living with his wife under the community regime. He died intestate, and the interest which he had acquired in the minerals was then owned by his widow, Mrs. Annie Norton, and his son R. W. Norton, Jr., who was his sole heir.

Subsequently, D. L. Perkins, A. J. Hodges, W. J. Hobby, H. C. Cate, J. C. Palmer, E. G. Morehead, and Brooks Van Horn acquired undivided fractional interests in the 1/2 of the minerals which H. J. Wilder had acquired from J. B. Baker on December 3, 1928.

On September 26, 1929, J. B. Baker, who had on December 3, 1928, sold to H. J. Wilder 1/2 the minerals in his land, sold the land itself to R. E. Baker. On August 24, 1935, there was filed and recorded in the conveyance records of Claiborne Parish an oil and gas lease covering the land involved, signed by R. E. Baker, the then owner of the land in fee and the owner of 1/2 of the minerals; by J. B. Baker, who had sold the land to R. E. Baker and who held a mortgage thereon, and by H. J. Wilder, D. L. Perkins, A. J. Hodges, G. G. Nesbitt, Jr., W. J. Hobby, H. C. Cate, R. W. Norton, J. C. Palmer, and E. G. Morehead. This lease was dated April 20, 1935, and was made to F. Lee Watson, the primary term expressed therein being 10 years from the date of its execution. The consideration for the lease was $160 cash, and it was provided in the lease that it might be kept alive for 10 years by the payment of delay rentals of $1 per acre.

On January 31, 1939, R. E. Baker, the fee owner of the land when this lease was executed, sold the land to his brother, H. G. Baker. H. G. Baker filed this suit on September 20, 1941, alleging that the servitude on the land which came into existence when J. B. Baker sold 1/2 the minerals in

the land to H. J. Wilder on December 3, 1928, had long since expired and become extinguished because of the non-use of it for a period of more than 10 years, and that he was then the owner of the entire interest in the minerals.

He further alleged that Mrs. Annie Norton, R. W. Norton, Jr., G. G. Nesbitt, Jr., H. J. Wilder, and H. C. Cate then claimed to own certain interests in the minerals in his land and interests in the servitude acquired by Wilder from J. B. Baker on December 3, 1928, and refused to relinquish their claims, notwithstanding the fact that the servitude had long since become extinct, and that their asserted claims operated as a cloud upon his title. He prayed for judgment decreeing that he was then the owner of the land, free and clear from any claims of the defendants to any interest in the oil, gas, and other minerals in or under the land, and decreeing that the servitude which came into existence on December 3, 1928, had been lost or extinguished by non-user for a period of more than 10 years.

The defendants filed answer in which they denied that plaintiff was the owner of the land, alleging that the purported deed under which he claimed was a sham and a simulation. This defense seems to have been abandoned. Counsel did not mention it in oral argument before this court, nor is it referred to in their brief.

Defendants specifically denied that plaintiff was the owner of, and in possession of, all of the "oil, gas and other minerals in, on and under and that may be produced from said land; and that said land is free

from any servitude or encumbrance thereon, as will more fully appear hereinafter". They admitted in Paragraph 3 of their answer that they claimed to be the owners "of fractional parts of the mineral servitude described in article 3 of the plaintiff's petition", and admitted in Paragraph 5 that they had "refused to make relinquishment or quitclaim to plaintiff" renouncing their asserted interests in the minerals.

Further answering, defendants alleged in Paragraph 8 of their answer "that they are the true and lawful owners" of certain designated fractional interests "in the oil, gas and other minerals in, on and under and that may be produced from the land described in article 1 of plaintiff's petition".

They admitted that the servitude, which came into existence on December 3, 1928, had never been used, but averred that the same had not been lost by the prescription of 10 years, for the reason that on April 20, 1935, R. E. Baker, the then owner of the land in fee, and the various persons who had acquired interests in the Wilder servitude had executed a joint oil and gas lease in favor of F. Lee Watson, which lease had a primary term of 10 years and extended, according to its terms, far beyond the normal expiration date of the servitude, and that the execution of this joint lease was an acknowledgment by the then landowner of the rights and interests of his co-lessors, and that such acknowledgment interrupted the running of prescription.

Defendants further alleged that on November 15, 1935, R. E. Baker, the then fee owner of the land, and E. G. Morehead and Brooks Van Horn, owners of fractional in-

terests in the minerals, executed a "co-lessors' agreement" in favor of F. Lee Watson, the lessee named in the lease dated April 20, 1935, in which agreement they joined and concurred in the oil and gas lease dated April 20, 1935; and they alleged that the parties "believed and intended that the execution of said lease by said parties under such circumstances would have the effect of an acknowledgment on the part of the landowners of the existence of the mineral rights of the other lessors for the purpose of interrupting the running of prescription under Louisiana Revised Civil Code, article 3546, against said mineral rights".

Defendants alleged in Paragraph 18 of their answer that "the said R. E. Baker executed the aforesaid oil and gas lease and the aforesaid 'co-lessor's agreement' with the intent and for the purpose of acknowledging the existence of the mineral rights of the other parties who have signed said documents as co-lessors with the said R. E. Baker and to interrupt the running of prescription under article 3546 of the Louisiana Revised Civil Code against said mineral rights, and that, in consideration therefor, he received the part of the bonus stipulated in said lease that would have been paid to the owners of said mineral rights except for their agreement that it be paid to the landowner in consideration of his act acknowledging their mineral rights for the purpose of interrupting the running of prescription against them".

There was judgment in the district court in favor of the plaintiff H. G. Baker and against the defendants, decreeing that the

plaintiff was the owner of the land involved "free and clear of any claims of the said defendants to any interest in the oil, gas or other minerals on, in and under and that may be produced from said land, and that the servitude granted by J. B. Baker to H. J. Wilder on December 3, 1928, * * * be and the same is hereby decreed to have been lost on account of non-usage for more than ten (10) years; and the same is hereby cancelled".

Mrs. Annie Norton, R. W. Norton, Jr., and G. G. Nesbitt, Jr., appealed to the Court of Appeal, which court affirmed the judgment. Thereupon, appellants applied to this court for writs, which were granted.

The servitude here involved came into existence on December 3, 1928, when J. B. Baker, the then owner of the land, sold to H. J. Wilder a 1/2 interest in the minerals in and under the land. Ten years from that date, or on December 3, 1938, that servitude was extinguished by the prescription of 10 years unless the running of prescription was interrupted in some way recognized by law. The defendants in the suit, who are relators here, acquired their interests in the minerals and the servitude by mesne conveyances from Wilder, and they admit that the running of prescription was not interrupted by the use of the servitude. No effort was made to explore the land for minerals during the 10-year period immediately following the date on which the servitude came into existence. But their contention is that the running of prescription was interrupted on April 20, 1935, when R. E. Baker, the then owner of the land in fee,

and the various persons who had acquired interests in the Wilder servitude executed a mineral lease in favor of F. Lee Watson, which lease had a primary term of 10 years and which, if kept alive by the payment of delay rentals, would extend far beyond the expiration date of the servitude. Their contention is that this was a "joint lease", and they cite, and rely principally on, the case of Mulhern v. Hayne et al., 171 La. 1003, 132 So. 659, where it was held that Mulhern's joining the owners of the servitude in the execution of an oil and gas lease was an acknowledgment by him of their rights, and interrupted prescription. The ruling in the Mulhern case was explained by this court in the case of Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75, 77, where we said:

"This was upon the theory that Mulhern's joining the others in the lease contract, which by its terms expired on a date beyond the end of the ten-year prescriptive period, evidenced a purpose and intent on his part to interrupt the running of prescription in his favor; that his execution of the lease under the circumstances was not only an acknowledgment of the existence of the rights of the owners of the servitude, but in fact a consent that they have further time within which to exercise those rights. Manifestly the life of the servitude had to be extended to make the five-year lease valid for that length of time."

This explanation of the Mulhern case was approved in the following later cases: Kennedy v. Pelican Well Tool Co., 188 La. 811, 178 So. 359; English v. Blackman, 189 La. 255, 179 So. 306; Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Vincent v. Bullock, 192 La. 1, 187 So. 35; Hightower v. Maritzky, 194 La. 998, 195 So. 518; Achee v. Caillouet, 197 La. 313, 1 So.2d 530 (on rehearing), and Spears v. Nesbitt, 197 La. 931, 2 So.2d 650.

We have repeatedly said that the only issue squarely presented in the Mulhern case was decided correctly, but that the effect of the ruling there had apparently been misunderstood. In the Achee-Caillouet case, supra, it was argued that what was held in the Mulhern case was that the effect of Mulhern's joining with the owners of the servitude in making a five-year lease not only was an acknowledgment on Mulhern's part of the rights and privileges of the owners of the servitude, but was such an interruption of the running of prescription as to cause the servitude to be "born again as of that date" (i.e., the date of the lease), and that the servitude "lived on for a period of 10 years from the date of the interruption" [197 La. 313, 1 So.2d 534]. We held that such interpretation of the ruling in the Mulhern case was erroneous, and reaffirmed the interpretation in the Bremer case of the ruling in the Mulhern case, which was that Mulhern, the owner of the land, by entering into a joint lease with the owners of the servitude evidently intended to extend the life of the servitude to the expiration date of the lease in order that the lease might be effective.

But in the Mulhern case the question whether the lease was a joint lease, in the true sense, was not raised. In that case it seems to have been conceded, and in all the

subsequent cases in which that case was cited and explained it was assumed, that the lease was in the true sense a joint lease, entered into by the owner of the land and the owners of the servitude; a contract entered into by the parties, who joined together or acted unitedly for a common purpose understood and agreed to by each and all of them.

In the case at bar, the lease contract dated April 20, 1935, was signed not only by the landowner, but by each of the persons who claimed to own an interest in the servitude. But the contention of the plaintiff is that this lease was not, in the true sense, a "joint lease". In support of this contention, counsel for plaintiff cite English v. Blackman and Achee v. Caillouet (on first hearing), supra, in which cases the facts surrounding the execution of the leases were similar to those connected with the execution of the lease in this case, and in each of which it was held that the lease involved was not, in the true sense, a joint lease.

In the case at bar, it is definitely shown that the landowner and the owners of the servitude were not together when they signed the lease. The lease is a private act, and the signatures thereto were proved by affidavits made before various notaries by persons who had signed the documents as witnesses. On April 20, 1935, the date which the lease bears, E. E. Simmons appeared before C. B. Miller, a notary public for the Parish of Claiborne, and made oath that he saw R. E. Baker and J. B. Baker sign the instrument. (The testimony shows that the reason J. B. Baker signed the instrument was that he was the holder of a mortgage on the land.)

On August 24, 1935, a few months later, J. A. Selby made oath before J. W. Williams, a notary for the Parish of Caddo, that he had seen R. W. Norton sign the instrument at the time that he signed it as a witness. On August 22, 1935, a few months after the Bakers had signed, Mrs. Julia Randall Watson (wife of the lessee) appeared before C. B. Miller, a notary for the Parish of Claiborne, and made oath that she saw G. G. Nesbitt, Jr., sign the act on that date. On June 19, 1935, two months after the Bakers had signed, Julia Randall Watson appeared before F. L. Pryor, a notary public in and for Harris County, Texas, and made oath that she was the subscribing witness to the instrument, and that she saw A. J. Hodges, D. L. Perkins, E. G. Morehead, W. J. Hobby, H. J. Wilder, J. C. Palmer, and H. C. Cate sign their names to the instrument. The record shows that some of these parties lived in Texas.

According to the certified copy of the lease in the record, Julia Randall Watson, the wife of the lessee, signed the instrument as a witness eight times. This shows unmistakably that the parties whose signatures she attested were not all together when they signed, because, if they had been, it would not have been necessary for her to attach her signature as a witness more than once. She made two affidavits, one in the State of Texas, where she stated to the notary that she had seen seven of the parties sign, and the other, made before a notary in Claiborne Parish, where she stated that she had seen one of them sign. Evi-

dently what she did was to carry the instrument around from person to person and get each to sign, and, after they had all signed, she made the affidavits.

On the face of the instrument, it clearly appears that the landowner signed the instrument on the date it bears in the Parish of Claiborne, where the land is situated and where he then resided. If any of the other parties to the lease had been present and had signed at the time he did, that would have been shown by the affidavit of E. E. Simmons, made before Miller, the notary in Claiborne Parish, verifying the signatures of the two Bakers.

The lease is on a printed form with blanks to be filled in. The necessary data were written in with a typewriter. But the names of the parties to the agreement are not written on the lease form, but are typewritten on a separate sheet of paper, which is attached by paste to the top of the instrument. F. Lee Watson, the lessee, testified that he did not recall whether or not this typewritten sheet, on which were written the names of all the parties to the lease, was attached to the lease at the time it was signed by the landowner, and there is no testimony in the record to show that, as a matter of fact, it was so attached when any of the parties signed. It follows, therefore, that, so far as the instrument itself is concerned, there is nothing to indicate that the landowner knew who was to sign it after he signed, or whether, in fact, anyone else was to sign it. He was the first to sign, and the testimony shows that he did not see the instrument after it was signed

by him, unless he saw it after it was recorded.

Counsel for relators say the testimony shows that the landowner knew at the time he signed the lease that it was to be signed by the owners of the mineral servitude. R. E. Baker, the former landowner, who resided in Mississippi at the time the case was tried, was not called as a witness, nor was his testimony taken out of court. The testimony relied upon by relator is that of Watson, the lessee, who said that he was present when R. E. Baker signed the lease. He was asked whether he had any conversation with Baker, the landowner, before or at the time of the signing of the lease concerning ownership by other persons of minerals in the land covered by the lease. His answer was:

"I think it might have been mentioned that there were outstanding minerals. In fact I did remind him that there were outstanding minerals. That is, I did discuss it with R. E. Baker covering that particular land, that there were outstanding minerals; which he was aware of the fact."

He was then asked: "Did you have any conversation with him as to who would sign the lease in addition to him?" His answer was: "No, not any particular coincident [conversation]. I told him that I wanted to get a block of acreage and I wanted all the landowners and mineral owners to sign that same lease, the purpose being to save recording fees as well as other things to my advantage." He was then asked whether Mr. Baker consented to that, and his answer was that Baker said: "It

doesn't make any difference. They are not going to get any well anyway."

Mr. Watson was asked: "Is it your testimony that R. E. Baker when he executed this lease knew that you were obtaining the signatures of the mineral owners to this same document with him?" And he answered:

"Generally I told all of them [the landowners], that I only paid—well, yes, I told all of the—my intent was to tell all of them that the mineral owners would not sign a lease—wouldn't sign a lease to me for their mineral interests unless they could sign the lease with the landowners. That was the general—that was the general—what shall I say, what word there? That was the general discussion in getting up this block, you might say."

This testimony, in so far as the main issue involved is concerned, is about as vague and indefinite as can be imagined. It is equivocal and falls far short of proof that Watson informed Baker that others were to sign the lease or who, if anyone, would sign it. Mr. Watson testified that he was getting a block of leases in that territory—that he obtained about 90 leases in all, covering thousands of acres of land; that there were other Bakers who signed leases at or about the same time. And his testimony clearly shows that he could not recall definitely all of the circumstances connected with the signing of the particular lease here involved.

Counsel for relators say in their brief at page 12 that the testimony of F. Lee Watson, the lessee, shows conclusively that R.

E. Baker knew that the mineral owners were to sign the lease, that he consented thereto, and that Watson told him that the mineral owners would not sign a lease unless they could sign with the landowners. In support of their argument on this point, counsel referred to the testimony quoted above. But, as we have said, that testimony is too vague and indefinite to be classed as proof of the assertions made by counsel.

It is certain that Baker, the landowner, did not discuss the matter of granting the lease with the others at the time, or before, he signed it; that he did not join them or act unitedly with them in making the lease; and, if it be conceded, as counsel for relators argue, that he knew others were to sign it, such knowledge and his signing of the lease can be construed as nothing more than a bare acknowledgment of their rights. But such bare acknowledgment is not sufficient to interrupt the running of prescription. As we said in the Bremer case, supra, "the acknowledgment must be accompanied by or coupled with 'the purpose and intention of the party making the acknowledgment to interrupt the prescription then running'."

There is nothing in the record to show or even to indicate that Baker intended to interrupt the running of prescription. As we said in the case of White v. Hodges, 201 La. 1, 9 So.2d 433, 437, the owners of a servitude are powerless to extend their mineral rights without the consent of the landowners, "who under the law must clearly and definitely state or act in such a way so as to show that it was their intention to

interrupt the running of prescription and start it anew."

In the case of Hightower v. Maritzky, supra [194 La. 998, 195 So. 521], we said: "In order for an acknowledgment by a landowner that his land is subject to certain mineral rights in favor of a person named in the acknowledgment to have the effect of interrupting the prescription by which such rights are extinguished the intention that the acknowledgment shall have that effect must be expressed in unmistakable terms."

█ In support of this statement we cited seven Louisiana cases and Daggett on Mineral Rights in Louisiana, Section 14, pp. 38–52. So far as the record discloses, Baker, the landowner, never at any time indicated by act, word, or deed that he intended to interrupt the running of prescription.

Relators also rely on a so-called "co-lessors' agreement", signed on November 15, 1935, nearly seven months after the date of the lease, by R. E. Baker, the landowner, and by E. G. Morehead and Brooks Van Horn, the latter two having at one time claimed an interest in the minerals and in the servitude. That instrument recites that, whereas R. E. Baker, E. G. Morehead, and Brooks Van Horn granted to and in favor of F. Lee Watson, of Houston, Texas, a certain oil and gas lease on April 20, 1935, covering the land involved in this case, "Now, therefore, taking full cognizance of the terms, conditions, recitals and stipulations contained in said oil and gas lease and wishing to join and concur in said oil and gas lease as a co-lessor, we R. E. Baker, E.

G. Morehead, and Brooks Van Horn * * * do hereby join and concur in said oil and gas lease as co-owner of the minerals in and under the following described land * * * and as such co-owner, and as a co-lessor, the said oil and gas lease is hereby recognized, ratified and confirmed as to all terms, conditions, recitals and stipulations therein contained just as if same were set out fully and incorporated herein, it being the intention that this instrument shall express full concurrence as a co-lessor in said lease and shall have the same effect as signing my name to said oil and gas lease as co-lessor at the time of its execution".

█ There is nothing in the language of this instrument to indicate that Baker signed it with the purpose and intent of interrupting the running of prescription, nor is there anything in the testimony to show such intent. The parties were not together when the instrument was signed. Morehead testified that he was not personally acquainted with Baker and had never seen him. Even if we give this instrument a construction most favorable to relators, the most that can be said of it is that Baker's signing it was but a bare acknowledgment of the rights and interests of Morehead and Van Horn. But such acknowledgment was not sufficient to interrupt the running of prescription even as to Morehead and Van Horn, who are not parties to this suit. They have abandoned all claims they ever had to an interest in the minerals and the servitude.

For the reasons assigned, the judgment under review is affirmed.

HAMITER, J., recused.