117 So.2d 575

CROWN CENTRAL PETROLEUM
CORPORATION

v.

Hermina David BAROUSSE et al.

No. 44764.

Jan. 11, 1960.

Rehearing Denied Feb. 15, 1960.

J. Nilas Young, Eunice, for defendants-appellants.

Edwin W. Edwards, Crowley, Wesley H. Clanton, Eunice, for defendants-appellees.

Pugh, Buatt & Pugh, Crowley, for appellees.

McCALEB, Justice.

This concursus proceeding was provoked by Crown Central Petroleum Corporation in order to determine ownership of royalties accruing under an oil, gas and mineral lease executed by Homer Barousse, Jr. on June 24, 1948, covering an 150-acre tract of land in Acadia Parish. Prior to 1943, Barousse owned the entirety of the surface and minerals of this tract but, on October 21, 1943 he sold a ⅛₂nd mineral royalty interest in approximately 110 of the acres to Andrew J. Wilfert. On January 22, 1944 Barousse sold a ⅛₄th mineral royalty interest in approximately 112 acres of the tract to M. N. Stafford, and another ⅛₄th mineral royalty interest in the same area to A. C. Gardiner. By various conveyances, the interests represented by those three royalty sales (amounting in all to a ⅛₆th mineral royalty) have passed into the hands of some 13 persons who have been designated by plaintiff in these proceedings as the "First Group" while the ownership of the Barousse tract has passed, by conveyance and inheritance, into the hands of 19 other persons, who have been designated as the "Second Group".

The mineral lease executed by Barousse on June 24, 1948, which is now owned by Crown Central Petroleum Corporation, is still in effect as a consequence of production obtained from the lands chiefly through pooling agreements unitizing segments of the tract with other mineral properties. On August 15, 1952, twenty-four acres of the Southwestern portion of the tract were conventionally grouped with other adjacent lands in a drilling unit (known as the Harmon-A-Unit) for the purpose of producing gas and gas distillate therefrom. Subsequently, on November 12, 1952, within 10 years from the date the first royalty was sold, a well was completed on the unit, although not on the tract here in question, and has been producing gas and gas distillate continuously ever since.

On December 1, 1954, more than 10 years since the last royalty was sold by Barousse, another conventional unit was formed which embraced all land in the 150-acre tract except the 24 acres in the Harmon-A-Unit. In addition, the Conservation Department created other units on March 8, 1955 and June 14, 1955, which included various parts of the Barousse tract and the other units which were already on it. There is no dispute over the fact that production from the well on the Harmon-A-Unit effectively interrupted the prescription which was accruing against the "First Group's" royalty interest in the twenty-four acres included in that unit. A controversy

does exist, however, over whether or not production on the Harmon-A-Unit, prior to October 21, 1953, from a well not located on the Barousse tract, had the effect of tolling the prescription of ten years on the royalty interests burdening the remaining part of the land which was not included in the Harmon-A-Unit.

The district judge found that the provisions of paragraph 4 of the mineral lease (in which Barousse granted the lessee the authority to pool his land, or any part thereof, with other lands for development purposes) and the provisions of the unitization agreement (signed by the interested parties) "indicate a clear intention on the part of all parties that if the unit well produced, it would constitute production from the lands involved in this dispute, and that such production would operate to preserve the royalty rights of all parties in the 'First Group' ". Accordingly, judgment was rendered in favor of the "First Group" recognizing and maintaining their royalty rights in and to all lands described in the royalty deeds.

The "Second Group" prosecuted this appeal from the adverse decision contending (1) that the judge erred in holding that the provisions of the mineral lease and the pooling agreement establishing the Harmon-A-Unit reflected that the parties intended that production from the unit would be considered production from all land subjected to the royalty rights, and (2) that

the judge should have held that the mineral royalty rights had been divided by the unitization agreement, the case being governed by the rulings in Elson v. Mathewes, 224 La. 417, 69 So.2d 734; Childs v. Washington, 229 La. 869, 87 So.2d 111 and Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721.

In addition to the reasons given by the judge for his resolution in their favor, appellees claim that paragraph 4 of the mineral lease executed by Barousse and paragraph 6 of the pooling agreement establishing the Harmon-A-Unit evidences an acknowledgment on the part of the parties of the "Second Group" or their privies which effectuated an interruption of prescription.

 It is settled that the sale of a mineral royalty by the owner of a tract of land imposes upon the property a real obligation being a species of real right running with the land. Such a sale does not create a servitude but it is nevertheless governed by the rules of suspensive conditional obligations and subject to the prescription of ten years liberandi causa if the event, i. e., the production of minerals from the land, does not occur prior thereto. Vincent v. Bullock, 192 La. 1, 187 So. 35; Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73 and cases there cited. It is also well established that the right to search and explore, which is implicit in the grant of a mineral servitude, does not attach to the sale of royalty and that the royalty owner's right to share

in the production is necessarily dependent upon the development of the property by either the landowner and/or the mineral owner, in cases in which a servitude has been created, or by a mineral lessee, holding under a lease from the landowner or mineral owner or both. Vincent v. Bullock, supra; Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38 and Le Blanc v. Haynesville Mercantile Co., Inc., 230 La. 299, 88 So.2d 377.

The royalty deeds executed by Barousse provide that a specified percentage of the whole "of any oil, gas and other minerals, except sulphur on and under and to be produced from said lands * * *" are conveyed, sold and transferred to the various grantees, and further state that the grantor reserves the right to grant future leases affecting the lands " * * * so long as there shall be included therein, for the benefit of the grantee herein, the royalty rights herein conveyed."

At the time these royalty rights were sold there was no existing lease on the property. The mineral lease covering the entire tract, subsequently granted by Barousse on June 24, 1948 to W. Bates White, plaintiff's predecessor in title, specially provided in paragraph 4 thereof that the mineral lessee was given the authority at his option to pool into units all or any part of the lands covered by the lease and further specified that:

" * * * All drilling, reworking or other operations on or production from any unit shall be considered as though such operations were carried on or production secured from land embraced in this lease whether or not the well or wells be located on this lease * * *."

■ This type of provision has been made unnecessary by our jurisprudence which holds that mineral leases are maintained in their entirety beyond their primary terms by obtaining production in paying quantities from operations on legally established units which embrace the leased tracts, either in part or in whole, even though no wells have been drilled on the leased land. See Boddie v. Drewett, 229 La. 1017, 87 So.2d 516 and the authorities cited in footnote 4 of that opinion. In the Boddie case, it was stated that "the same result obtains when a servitude is involved for it is plain that an actual use of the minerals occurs when they are extracted from under the land and, hence, it is immaterial whether the operations are conducted on the land burdened by the servitude or from without." See 229 La. 1021, 87 So.2d 517.

■ Hence, it is clear from the foregoing that not only did production on the Harmon-A-Unit have the effect of maintaining the Crown Central lease in its entirety, but such production constituted a contractual, if not factual, use of the min-

erals under at least a part of the Barousse tract and, if the Barousse tract had been burdened with a mineral servitude, prescription would have been interrupted as to the whole of that servitude by production on the Harmon-A-Unit, in the absence of a forced or contractual division of that servitude.[1]

■ Since, as above stated, production from the Harmon-A-Unit must be considered as production from at least a part of the Barousse tract, it follows that prescription was interrupted as to the entirety of any royalty interests which burdened that part of the Barousse tract included in the unit. This is because production from any part of a tract subject to royalty interests ordinarily interrupts the running of prescription as to the entirety of those interests.

Indeed, it is conceded in this case, as it must be in view of paragraph 6 of the pooling agreement[2] under which the Harmon-A-Unit was created, and our recent decision in LeBlanc v. Haynesville Mercantile Co. Inc., supra, that the production obtained on the unit from a well located on lands other than the acreage subjected to the royalties here in question, interrupted the prescription which was running on the royalty interests that burdened the 24 acres of the Barousse tract included in the unit. But counsel says that production on the unit and payment of royalties did not interrupt prescription as to the royalty rights which burdened that part of the Barousse tract not included in the unit because there was no production from that part during the prescriptive period.

■■ We do not think this position is well founded for the reasons which will be hereinafter pointed out. But, first, it should be said that we do not agree with appellees' contention that there was an interruption of prescription by acknowledgment of the landowner. There is nothing either in the lease or the unitization agreement spelling out any intention on the part of Barousse to effect an interruption of prescription. In interpreting Article 3520 of our Civil Code, which provides that prescription ceases to run whenever the debtor or possessor acknowledges the right of the person whose title is said to have prescribed, this Court has often stated that something more is required than the mere acknowledgment of

1. This is impliedly, if not expressly, recognized in Elson v. Mathewes, 224 La. 417, 69 So.2d 734, a case strongly relied on by counsel for the "Second Group".

2. It provides in part as follows: " * * * Drilling or reworking operations in connection with the production of gas and gas condensate or gas distillate on, or the production of gas and gas condensate or gas distillate from, any portion of the lands within said unitized area shall be considered as drilling or reworking operations on and production from all the lands within said Unit and under all the leases affecting any portion of said lands; and, to that extent, said leases are amended and supplemented accordingly, * * * ".

the existence of mineral rights in a third person and that there must be coupled with the acknowledgment a specific intent of the party making it to interrupt the prescription then accruing. Hightower v. Maritzky, 194 La. 998, 195 So. 518; Achee v. Caillouet, 197 La. 313, 1 So.2d 530; Baker v. Wilder, 204 La. 759, 16 So.2d 346 and Liberty Farms v. Miller, 216 La. 1023, 45 So.2d 610.

Nor do we find it necessary to determine whether the district judge was correct in his holding that paragraph 4 of the mineral lease and the provisions of paragraph 6 of the unitization agreement clearly indicated that the parties intended that production from the unit well would constitute production from that part of the Barousse tract not included in the unit so as to preserve all of the royalty interests therein. It suffices to deduce, as we do, that production from the Harmon-A-Unit well constituted, by virtue of the unitization agreement, production from part of the lands subjected to the mineral royalties and thereby interrupted the prescription accruing under these royalty rights unless, as was found in Elson v. Mathewes, supra, the royalty rights were divided conventionally by the pooling agreement under which the Harmon-A-Unit was formed.

Elson v. Mathewes involved the question of whether a mineral servitude, which had been created by the defendant landowner in favor of the plaintiff covering two contiguous tracts totalling 91 acres, had been kept alive as to one of the tracts embracing 51 acres, by the production attributable to the other tract of 40 acres obtained from a well drilled on adjacent property under a unitization agreement between the mineral lessee, the mineral owner and the landowner. It was conceded therein that prescription had been interrupted as to that part of the servitude covering the 40 acres situated within the unit but plaintiff contended that, since a servitude is indivisible, the interruption of prescription as to the 40-acre tract effected an interruption as to the other tract comprising 51 acres. The Court, after recognizing that a mineral servitude is indivisible "in the sense that the grantor thereafter cannot contract independently with a third person to effect a division of that servitude to the disadvantage of the mineral owner * * *" [224 La. 417, 69 So.2d 735] stated that there was no law prohibiting the landowner and mineral owner from contracting with each other, whereby a division or reduction of the servitude results. From this premise it was found, upon consideration of the unitization and pooling contract, that the parties had agreed that the single servitude be divided into two servitudes, one covering the 40-acre tract, as to which prescription was admittedly interrupted, and the other embracing the 51-acre tract, which had prescribed because there had been no exploration thereon within the 10-year period.

We do not think that the ruling in Elson v. Mathewes controls this case for the reason that the unitization agreement under consideration cannot be said to reflect an intention of the royalty owners and the landowner to divide the various royalty interests bearing upon the tract into two component parts, that is, a 24-acre tract which formed part of the unit and another tract which was not embraced therein.

In the first place, an examination of the unitization agreement discloses that the contracting parties are the three oil companies holding leases on the lands contained in the unit, who are designated in the agreement as "Lease Owners", and the several parties owning title to or royalty rights in the various portions of the lands comprising the unit, these parties being collectively referred to as "Royalty Owners". The contract was not a tri-party agreement between the landowners, the royalty owners and the lease owners but, conversely, appears to be a bi-party one between all lease owners and all royalty owners, whether they were landowners, mineral owners or merely those who had purchased royalties. This being so, it cannot be rightly said that the purchasers of royalties from the landowners had any agreement with the latter to divide their royalty rights into two segments.

Furthermore, as tersely pointed out in LeBlanc v. Haynesville Mercantile Co., supra, the purchasers of royalty interests from a landowner, having no right whatever to develop the property, were not necessary parties to the unitization agreement and could not control the absolute right granted by the landowner to his lessee in the mineral lease to pool and combine the leased acreage or any portion thereof with any lands and mineral interests in the immediate vicinity, the rights of the royalty owners being limited to the right to secure and receive the royalty due out of any production obtained from the land.

Hence, even were we to regard the unitization agreement as an arms-length contract between the landowner and royalty owners, in which the latter consented to divide their royalty interests, it is doubtful whether such a concession, being without any consideration whatsoever, could be legally enforced.

We are further of the opinion that the cases of Childs v. Washington and Jumonville Pipe and Mach. Co. v. Federal Land Bank, supra, relied on by counsel for the "Second Group" are inapplicable to the case at bar. Those matters involved the legal effect, insofar as servitudes were concerned, of orders of unitization entered by the Commissioner of Conservation for the efficient recovery of oil and other minerals pursuant to modern techniques. The holding of the Court was that all lawful forced pooling orders which included part of land burdened by a mineral servitude effected a

division of the servitude and that drilling and production upon lands included in the unit, but not upon property subjected to the servitude, did not interrupt the running of prescription as to the part of the servitude outside of the unit.

The Childs and Jumonville decisions might be applicable to royalty rights as it could be plausibly argued that, when the Department of Conservation has issued orders unitizing only a part of land affected by mineral royalty, a division of the royalty is effected and that production from the unit, from a well not situated on any part of the land subjected to the royalty, does not interrupt prescription as to the royalty on the land outside the unit. However, we are not dealing in this case with unitization orders of the Conservation Department. The question here is whether a voluntary conventional unitization agreement divided royalty rights into two segments, and we hold that those rights were not divided by the agreement.

The judgment appealed from is affirmed.

HAMITER, J., dissents.

HAWTHORNE, J., dissents and will assign written reasons.

HAWTHORNE, Justice (dissenting).

I respectfully dissent from the holding that accruing prescription has been interrupted as to the mineral royalty rights from lands located outside the Harmon-A-Unit. It must be remembered that there has not been any production of minerals *in fact* from any part of the Barousse tract within 10 years of the date of the royalty sales, and, further, that only 24 acres of this tract were included in the Harmon-A-Unit. I am in full accord with the statement in the majority opinion that production from lands in the unit, although from a well drilled not on the Barousse tract but on other lands in the unit, interrupted the running of prescription as to the royalty under the 24 acres of the Barousse tract which were in the conventional unit, and as to this there is no dispute. But I do not think the majority opinion gives any sound reasons for holding that prescription has been interrupted as to the royalty on the remaining property comprising this tract. As I view the matter, such a holding will cause much litigation, and will afford a means of perpetuating for more than 10 years mineral rights without exercise of the servitude, and royalty rights without actual production. Under the holding of this case all that one will need to do to bring about such a result—a result which circumvents our law of prescription—will be (1) to include a small part of a large tract subject to the mineral servitude or the royalty rights in a conventional unit containing other lands on which a well has been drilled and production obtained and (2) to omit to declare or ex-

press the intent or consent to divide the servitude or the royalty rights.

As I understand the majority opinion, the reason given for holding that prescription has been interrupted is simply that the conventional unitization agreement executed by the parties does not disclose or reflect an intent or consent by the royalty owners and the landowners to divide their royalty rights into two segments, one segment being those on the 24 acres of the Barousse tract in the unit and the other those on the remaining property outside the unit, because the unitization contract was not a triparty agreement among the landowners, the royalty owners, and the lease owners, but appeared to be a biparty agreement between all lease owners on the one part and all royalty owners on the other part, whether these latter are landowners, mineral owners, or merely royalty owners. How the form of this unitization agreement shows an absence of intent or consent to divide the royalty rights I am at a loss to understand.

The majority opinion states that the holding of this court in the case of Elson v. Mathewes, 224 La. 417, 69 So.2d 734, 735, is not controlling here. In that case the interest in dispute was a mineral servitude. There by the execution of a pooling or unitization agreement a unit was formed which included 40 acres of a 91-acre tract. A well was subsequently drilled in the unit and completed as a producer, but this well was not on any part of the 91-acre tract. The unitization agreement in that case provided:

"* * * This agreement is executed with the specific purpose and intent on the part of each of the parties hereto to acknowledge the ownership of each and all of the parties hereto of their respective interest in and to the oil, gas distillate, condensate and other minerals and mineral rights *in the lands pooled herein,* so as to interrupt the running of the liberative prescription of nonuse, applicable under the laws of Louisiana to mineral servitudes, and each monthly payment of any of the royalties or other benefits hereunder, shall be considered and accepted by all parties as new acknowledgment made with the purpose and intent of interrupting said prescription as to all rights of all of the parties hereto under all the servitudes."

In the instant case the unitization agreement provides, among other things:

"* * * hereby pool and unitize their royalty rights insofar as said royalty rights *relate to and affect lands within* the outline of said Harmon et al. Unit * * *.

"The pooling and unitization of the royalty rights * * * *shall be limited to royalties on and for gas and gas condensate or gas distillate produced from said unitized area* * * *. * * * Royalty

Owners shall receive only such portion of the royalty owned by each of them as the amount of each Royalty Owner's acreage within the Unit, or such Royalty Owner's interest therein, bears to the total acreage within the entire unitized area * * *. * * * Drilling or reworking operations in connection with the production of gas and gas condensate or gas distillate on, or the production of gas and gas condensate or gas distillate from, any portion of the lands within said unitized area shall be considered as drilling or reworking operations on and production from all the lands within said Unit and under all the leases affecting any portion of said lands; and, *to that extent, said leases are amended and supplemented accordingly * * *.* * * *" (Italics mine.)

In Elson v. Mathewes, supra, the court in holding that prescription had accrued as to the mineral servitudes insofar as they affected the land outside the unit said:

"Here, plaintiffs and the defendant, in the unitization and pooling contract, agreed to an interruption of prescription as to the 40-acre tract within the Dowling Unit, thereby extending the servitude as to it. However, the agreement made no mention of, and did not relate to, the remaining 51 acres (involved in this suit); and *this omission along with the failure* to drill on or otherwise use the 91 acres during the prescriptive period, resulted in 1947 in an extinguishment of the servitude to such extent. * * *" (Italics mine.)

Here, as in that case, the unitization agreement makes no mention of, or reference to, that part of the tract outside the unit, and we paraphrase what was said in Elson v. Mathewes and apply it to this case, thus:

"However, the agreement made no mention of, and did not relate to, the remaining acres outside the unit, and this omission along with the absence of actual production during the prescriptive period resulted in *an extinguishment of the royalty rights to such extent.*"

As stated previously, in Elson v. Mathewes we were dealing with a mineral servitude; but to hold that the rule of law in that case applies only to mineral servitudes *and not to mineral royalties,* and to hold that production of the area within the unit suspended or interrupted prescription of royalties on lands outside the unit, would give the royalty owner a right superior to that of the mineral owner. The holding in the instant case has, in effect, overruled the decision of this court in Elson v. Mathewes without specifically saying so, because in that case, as here, the conventional unitization agreement executed by the parties *did not declare or reflect an intent or consent of the parties to divide the mineral servitude except* by its failure to men-

tion the remaining property. Such an *omission* along with the failure to drill or use the servitude during 10 years resulted in its extinguishment *to the extent* of the property outside the unit. Due to the *omission* in the Elson case the servitude as to the remaining property was held to have prescribed for non-use although there was drilling in the unit, whereas in the instant case an *omission*—that is, the failure to declare an intent or consent to divide the royalty rights—has resulted in the interruption of prescription as to such rights due to production in the unit though not from the lands here involved. I cannot see why the holding in that case is not controlling here, since the conventional unitization agreement here under consideration does not mention or relate to that part of the Barousse tract outside the unit.

As I view the matter, the execution of the unitization agreement had the effect of dividing the royalty rights. Accordingly these rights are still in existence as to the lands in the unit, but have prescribed for want of production as to the lands outside the unit.

In conclusion I should like to state that I respect the views of the author of the majority opinion and of my other colleagues who subscribed to them, but I cannot agree with these conclusions for the reasons given above.

I respectfully dissent.