KNOLL, Judge.
Wayne Paul Laurents, Eugene Webre Laurents, Blanche Laurents Bourque, Yvonne Bourque Nunez (hereafter the Lau-rents Group), and Marshall E. Macdonell, Jr., Robert A. Macdonell, Esther Snoad Macdonell, Clara Hoag Macdonell, Jeff Davis Bank & Trust Co., Trustee for the Mac-donell Trusts for John Phillip Macdonell, Jr., Mark Emerson Macdonell and Thomas Lucius Macdonell, John Phillip Macdonell, Jr., and Elizabeth Lottinger Macdonell, as Natural Tutrix of Mark Emerson Macdo-nell and Thomas Lucius Macdonell (hereafter the Macdonell Group), appeal that portion of the judgment of the trial court in favor of the Central Oil Company Group, grantees of an undivided 3/64 royalty interest from the Laurents Group, and the Garth Group, grantees of an undivided 7/192 royalty interest from the Macdonell Group. We reverse that portion of the judgment appealed from, finding the royalty rights of the Central Oil Company Group and the Garth Group prescribed as they relate to land not included in the 1956 pooling agreement.
PACTS
The facts of this case are undisputed and have been summarized by the learned trial judge as follows:

“In May of 1981, Adobe Oil & Gas Corporation and Traverse Oil Company instituted this concursus proceeding alleging that they were stakeholders of certain funds from the production of oil and/or gas or other liquid hydrocarbons from that unit known as the Miogypsinoides Sand, Reservoir A, created by Louisiana Department of Conservation Order No. 745-C, dated July 3, 1980, and effective May 20, 1980, which funds were attributable to certain royalty interests on lands included in said unit. They allege that there is a dispute as to whether those royalty interests affecting certain portions of the property in said unit have been extinguished by ten years liberative prescription. As stakeholders, they have initially deposited in the registry of the court the sum of $19,533.76 because of the conflicting claims among the defendants made parties to this action.

All parties have entered into a Joint Stipulation of Fact. Those stipulations reveal that in 1955, Marshall E. MacDonell, Emerson F. MacDonell and Delta MacDonell entered into a series of royalty deeds transferring a total undivided 7/192 royalty interest in and to that tract referred to as the ‘MacDo-nell Tract’ and which property is more fully shown [as ///// on the plat at
*963
tached as Appendix A.] The present owners of the MacDonell Tract are the heirs, legatees and successors in title to Marshall E. MacDonell, Emerson F. MacDonell and Delta MacDonell and are described as Group ‘A’in the stipulation and referred to as the ‘MacDo-nell Group’. The grantees, or their heirs, legatees, successors or assigns, in the royalty deeds covering the MacDo-nell Tract are described as Group ‘B’in the stipulation and referred to as the ‘Garth Group.’

Involved in this matter are also those royalty deeds in 1954 from Margaret Pomeroy Laurents and Blanche M. Laurents covering and affecting that tract of land known as the ‘Laurents Tract’ which tract is shown [as ???? on the plat attached as Appendix A.] Said royalty deeds conveyed a total of 3/64 royalty interest in and to said property. The owner, or their heirs, legatees and successors, of the Laurents Tract are described as Group ‘C’ in the stipulation and referred to as the ‘Laurents Group’. The grantees, or their heirs, legatees, successors or assigns, in the royalty deeds covering the Laurents Tract are described as Group ‘D’ in the stipulation and are referred to as the ‘Central Oil Company Group. ’ Following these royalty transfers, the leasehold owners of oil, gas and mineral leases covering the Laurents and MacDonell Tracts entered into a unit declaration dated March 7, 1956, with the State of Louisiana creating a 320 acre unit for the H.L. Hawkins No. 2 Well, which well was located on the State Lease No. 2438 or on the bed and bottom of Lake Arthur which lies adjacent to the MacDonell and Laurents Tracts. A copy of this pooling agreement is attached to the stipulation. The 320 acres pooled in said declared unit as it affects the MacDonell and Laurents Tracts are outlined [with oo-ooo on the plat attached as Appendix A.] As can be seen from said plat, only certain portions of the Laurents and MacDonell Tracts were included within the 320 acres pooled by the agreement. These include 4A, 4F, 4G and 13A of the MacDonell Tract and tracts 8A, 9A and 11B of the Laurents Tract. Following the unit declaration, the H.L. Hawkins No. 2 Well produced oil/or gas or other liquid hydrocarbons in paying quantities continuously from 1956 to July 29, 1974.

In July of1979, Adobe Oil & Gas Corporation commenced drilling of the Mac-Donell No. 1 Well which was drilled and completed on the MacDonell Tract. The well began production of oil and/or gas or other liquid hydrocarbons in paying quantities on September 3, 1980, which production has continued to date. By Order No. 745-C, dated July 3, 1980, effective May 20, 1980, the Louisiana Department of Conservation created a producing unit for the Miogypsinoides Sand, Reservoir A. Unit. The surface boundaries of said unit contain 395 acres and are outlined [with XXXXX on the plat attached as Appendix A.] As can be seen from said plat, Order No. 745-C includes that portion of the MacDonell and Laurents Tracts which were previously included within the 320 acre declared unit for the H.L. Hawkins No. 2 Well situated on State Lease No. 2438 as well as portions of the MacDonell and Laurents Tracts situated outside of the 320 acre unit. Those tracts lying outside the 320 acre unit are tracts 4B, 4C, 4D, 4E and 13B of the MacDonell Tract which tracts total 68 acres and tracts 8B and 9B of the Laurents Tract which tracts total 14 acres.

Adobe Oil & Gas Corporation and Traverse Oil Company are the working interest owners of the leases found within the confines of the unit established under Order No. 745-C with Adobe named, pursuant to said order, as the operator of said unit.

After the creation of Order No. 745-C for the MacDonell No. 1 Well and the commencement of production therefrom, the question arose as to whether 
*964
ten years liberative prescription extinguished the royalty interest created by those royalty deeds covering the Mac-Donell and Laurents Tracts as to the 68 acres of the MacDonell Tract and the 14 acres of the Laurents Tract lying outside of the 320 acre declared unit but which are now included within Order 745-C. Accordingly, Adobe Oil & Gas Corporation and Traverse Oil Company suspended payment to said disputed interest which totals a unit participation of .0062716 of the MacDonell Tract and a .0016774 of the Laurents Tract and paid the funds attributable to the production therefrom into the registry of this court. What is presented, therefore, is the proper disposition of the disputed royalty interest as to lands not included within the 320 acre declared unit, but now included within Order No. 745-C.

Following the institution of this con-cursus proceeding, attorneys were appointed to represent the non-resident defendants. Answers were filed on behalf of the MacDonell Group and the Laurents Group. An answer was also filed on behalf of Exchange Oil & Gas Corporation, a defendant included in the Garth Group. Defendants, Sabine Corporation, Hibernia National Bank, New Orleans, Trustee for Winfield H. Perdun, et ux, Revocable Louisiana Trust and Millane Inc., defendants included in the Garth Group, and defendants Gulf Oil Corporation, George Schneider, Jr., Kathryn L. Schneider, George Scheider [sic], III, Susan Schneider and Steven M. Schneider, defendants included in the Central Oil Company Group, were duly served but failed to answer. A Motion and Order was filed on behalf of the MacDonell Group limiting the time for answering for these defendants pursuant to Louisiana Code of Civil Procedure Article 4657. After filing of said motion and the notice thereof, the record reflects that these defendants failed to answer within the delay as extended by this court and are now precluded from asserting any claim. ”
ISSUE PRESENTED
The sole issue presented is whether ten years liberative prescription extinguished the royalty interest of the Central Oil Company Group in the Laurents tract and the royalty interest of the Garth Group in the Macdonell tract in the acreage not encompassed within the 1956 voluntary unit.
PRESCRIPTION
The trial court ruled that LSA-R.S. 31:89 had no retrospective application and that under the holding of Crown Central Petroleum Corp. v. Barousse, 238 La. 1013, 117 So.2d 575 (1960), the royalty interests of the Central Oil Company Group and the Garth Group were preserved by an interruption of prescription. Succinctly stated, the trial court concluded that the grantees’ royalty interests on the portions of the Laurents and Macdonell property outside the 1956 voluntary unit were preserved when a well, neither on the Macdonell nor Laurents tracts, was drilled in 1956 within the voluntary unit and produced until 1974.
As noted by the trial court, the present mineral code answers the precise question presented on appeal favorably to the appellants. Particularly R.S. 31:89 provides:

“Production from a conventional or compulsory unit including all or part of the tract burdened by a mineral royalty interrupts prescription, but if the unit well is on land other than that burdened by the royalty, the interruption extends only to that portion of the tract included in the unit. ”

However, this provision of the mineral code was not applicable until 1975. The instant case arose after the effective date of the mineral code, but the facts of the case took place in large measure prior to the code’s effective date.
LSA-R.S. 31:214 provides that the mineral code is applicable to all mineral rights, including those existing on the effective date of the code, but that no provision may be applied to divest already vested rights *965 or to impair contractual obligations. The trial court held that the Central Oil Company Group and the Garth Group acquired vested rights which prevented the retroactive application of R.S. 31:89. We disagree.
As stated in Tennant v. Russell, 214 La. 1046, 39 So.2d 726 (1949), rights are vested “when ‘the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. The right must be absolute, complete, and unconditional, independent of a contingency, and a mere expectancy of future benefit, or a contingent interest in property ... does not constitute a vested right.’ ” Further, our jurisprudence has consistently held that the mineral code is applied retroactively where the particular issue has not been resolved to the contrary by pre-code litigation. Cox v. Sanders, 421 So.2d 869 (La.1982); Continental Group, Inc. v. Allison, 404 So.2d 428 (La.1981). Therefore, our initial inquiry is whether pre-code jurisprudence was so clearly settled that it vested defendants-ap-pellees (the Central Oil Company Group and the Garth Group) with rights that prohibit the retroactive application of R.S. 31:89.
As a preface to our analysis we quote the Louisiana Law Institute’s comments to R.S. 31:89:

“This rule [the provisions of R.S. 31:89] is harmonious with that applicable to mineral servitudes under Article 37. The prior jurisprudence regarding the effect of unitization on mineral royalties was unclear. In Frey v. Miller, 165 So.2d 43 (La.App 3d Cir.1964), writs denied, 216[246] La. 844, 167 So.2d 669, (1964) it was held that if a compulsory unit included only a portion of a royalty tract and the unit well was not located on the royalty tract, the interruption of prescription resulting from production affected only the acreage included within the servitude tract. Article 89 sustains that decision. Inconsistency in the prior law was found, however, in Crown Central Petroleum Corp. v. Barousse, 238 La, 1013, 117 So.2d 575 (1960), involving a contractual unit. In that case the court reached a resuli opposite to that in Frey v. Miller, supra. Also in Montie v. Sabine Royalty Co., 161 So.2d 118 (La.App.3d Cir.1964), it was held that where a unit including a portion of a royalty tract was formed by exercise of a voluntary pooling power granted by the lessor-landowner whose interest was burdened by the royalty in question, the entirety of the royalty tract was maintained by production from the unit even though the well was not located on the royalty tract. To maintain this inconsistency in the .jurisprudence would have been arbitrary particularly since a royalty owner is not even a necessary party to a unitization agreement.

Article 89 thus clarifies the jurisprudence and establishes a uniform rule applicable unless parties contract for a different result either in the instrument creating the mineral royalty or in some subsequent instrument. Contracting in this fashion is permissible. See Articles 3, 72, and 103. For further discussion of the related jurisprudence see the comment following Article 37. ” (Emphasis added.)

The unsettled nature of pre-code jurisprudence may be found in Elson v. Mathewes, 224 La. 417, 69 So.2d 734 (1953); Childs v. Washington, 229 La. 869, 87 So.2d 111 (1956); Jumonville Pipe & Mach. Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721 (1956); Crown Central Petroleum Corporation v. Barousse, supra; Montie v. Sabine Royalty Company, 161 So.2d 118 (La.App. 3rd Cir.1964), writ refused, 246 La. 84, 163 So.2d 359 (1964); Frey v. Miller, 165 So.2d 43 (La.App. 3rd Cir.1964), writ denied, 246 La. 844, 167 So.2d 669 (1964); Trunkline Gas Company v. Steen, 249 La. 520, 187 So.2d 720 (1966); Exchange Oil & Gas Company v. Foster, 237 So.2d 904 (La.App. 1st Cir.1970), writ refused, 256 La. 884, 239 So.2d 541 (1970); and Allied Chemical Corp. v. Despot, 414 So.2d 1346 (La.App. 2nd Cir. *966 1982). Elson and Crown Central, however, best exemplify the inconsistencies.
In Elson the parties voluntarily pooled a portion of a tract subject to a mineral servitude with other properties. A producing well was brought in on land included within the unit but not on the tract burdened by the mineral servitude. The question was presented as to the effect of the off-premises unit operations as to that portion of the mineral servitude lying outside the unit boundaries. Elson held that where a voluntary pooling agreement fails to mention part of a servitude not included in the unit, a division or reduction of the servitude results. The effect of such reduction is that production within the unit, but off a tract included therein, interrupts prescription only on that portion of the tract situated in the unit’s boundaries. Crown Central, decided six years later, reached a totally opposite result without overruling El-son. The question addressed in Crown Central was whether royalty rights prescribed as to that portion of a parent tract outside a voluntary unit because the producing well was not located on that part of the parent tract inside the unit. The Crown Central court concluded that production within the voluntary unit, but off the parent tract, interrupted prescription as to royalty rights on that part of the parent tract situated outside the unit. The Crown Central case received severe criticism, particularly because the interests of royalty owners received more favorable treatment than mineral servitude owners, a view contrary to jurisprudence. See: John M. McCollam, “A Primer for the Practice of Mineral Law under the New Mineral Code,” 50 Tul.L.Rev. 729 (1976), and cases cited therein.
As noted in Exchange Oil and Gas Co., supra, a case in which the Supreme Court denied writs, the distinctions between El-son and Crown Central are not clear:

“We are of the opinion that Crown, above, is indistinguishable from Elson, above, on the basis of the language contained in the respective pooling agreements. We likewise note that in Crown, the Court expressly rejected the premise that the language in the leases, royalty agreements, and pooling contracts, was the decisive and controlling factor. In this regard, Crown ignores the fact that the pooling agreement therein involved did not mention the effect production or drilling would have on that portion of the parent tract outside the unit, which exact same circumstance was present in Elson. In Crown, the Court also declined to find that the agreements in question indicated positive intent on the parties’ part to extend the effects of production so [sic] that part of the parent tract outside the unit.

Despite a detailed discussion of the matter of the intent of the parties in instances of this nature, the Court in Crown proceeds to negate the efficacy of such agreements between royalty owners and landowners, insofar as the rights of royalty owners are concerned, as indicated in the language herein-above quoted.

Recapitulating, we find that Crown pays lip service to the rule in Elson that when the agreement is silent as to lands outside the unit, the servitude is deemed to have been divided and the effect of its use limited to that part of the servitude within the unit. Crown then finds an absence of an intent to divide, which conclusion appears without foundation in view of the rule of interpretation laid down in Elson.

The foregoing impels us to conclude that Crown rejects the language of the contracting parties as the basis for its decision. If this analysis be correct, Crown stands postulated on the policy election of preserving the rights of royalty owners against landowners. The policy is justified on the ground that since a royalty owner is not a necessary party to a pooling agreement, the courts will zealously protect his rights. We can perceive justification for such a policy determination which protects the royalty owner to the extent of his legitimate contractual expectations. 
*967
Such a policy cannot, however, be justified insofar as it may afford a royalty owner rights greater than those contemplated in his separate and independent contract with the landowner. We are of the view that the royalty owner should not be denied the capacity to contract in this area. We are also of the view that when it is found that the royalty owner has so contracted, effect should be given to the agreement according to the intent of the parties as determined in each case.

We believe Crown cannot be reconciled with Trunkline insofar as Crown proclaims a policy which bestows on royalty owners rights exceeding their legitimate contractual expectations. In this respect, we share the views expressed by Justice Hawthorne in his dissent in Crown. The unmistakable holding in Trunkline is that the contractual expectations of those dealing in mineral rights can neither be enhanced or diminished, absent a conservation purpose. It would appear that Trunkline, by implication at least, has reversed Crown insofar as Crown extends the rights of royalty owners outside a unit where no conservation purpose is served.

In holding that production within a compulsory unit is limited to the unit area, Childs, Jumonville and Frey in effect recognized and applied the rule that facilitates and promotes running of prescription as to properties outside the unit in line with the policy of restrictive interpretation of interests which limit the full ownership of property and its free flow in commerce, as was held in Elson and the authorities therein cited. Crown obviously proclaimed a contradictory policy in apparent justification of protection of the interests of royalty owners whose rights depend solely upon production, which in turn is contingent upon the actions of the landowner and mineral owner. The rationale of Crown is that since a royalty owner is not a necessary party to a pooling agreement, the law protects his interest by limiting the effect of the landowner-mineral owner agreements upon the running of liberative prescription against royalty rights. Based solely on his ownership of a pure royalty interest, the royalty owner has no right to expect that production on other properties will interrupt prescription of his royalty interests. In giving the royalty owner the benefit of production on other properties both as to his royalty interests within and without the unit, Crown appears to have done violence to the policy of interpretation which facilitates and extends the running of liberative prescription against outstanding mineral rights.

In maintaining the efficacy of Childs, Jumonville and Frey, the Supreme Court in Trunkline applied a policy of liberal interpretation of liberative prescription which facilitates the running of prescription against outstanding mineral rights. The result in Trunk-line does not contravene this policy because Trunkline merely recognizes that existing contract rights are not affected by a compulsory Commisioner order and that operative factors within the unit are given effect outside the unit the same as if the order did not exist.

* # * * # *

We note that Frey expressly holds that in the absence of a clear expression from the Supreme Court to the contrary, uniformity should be the rule. On this express premise Frey applied to royalty rights the same rule applied to servitude rights in Childs and Jumon-ville. The Supreme Court’s refusal of writs in Frey appears to have endorsed at least the result reached in Frey.” (Emphasis added.)

Given the conflicting state of the pre-code jurisprudence in this area, we conclude that the Central Oil Company Group and the. Garth Group acquired no vested rights which would prohibit the retroactive application of R.S. 31:89.
*968 Our next inquiry is whether the Central Oil Company Group and the Garth Group contracted either in the instrument creating their mineral royalty or in any subsequent instrument for any greater rights than those provided in R.S. 31:89. Our examination of the royalty agreements reveals no language which would have modified the provisions of R.S. 31:89.
The voluntary pooling agreement between the state and the leasehold owners, the only subsequent instrument, specifically unitized a portion of the land. In particular, the pooling agreement provides in pertinent parts:

“For their mutual benefit and in order to promote conservation, State and Lessees do hereby create a pooled unit of320 acres for the exploration for and the production of gas and condensate which unit contains portions of the properties affected by said State Lease 2m.

* * * * * *

[A]nd it is agreed that drilling or reworking operations on or the production of gas and condensate from said pooled unit shall be considered as operations on or production of such minerals from_eoch^fj}ie_sepa7vdejmctsjm said unit and under the terms of each of the mineral leases affecting said tracts, ... All production of gas and condensate from said unit shall be allocated to the separate tracts in said unit in the proportion that the surface area of each such tract so included within the unit bears to the entire surface area of said unit, and the payment of proportionate royalties or other production payments according to such allocation shall be considered to be a full compliance with the terms of each of said mineral leases or other pertinent contracts. ” (Emphasis added.)

The tenor of the 1956 pooling agreement is restrictive and no intent is evinced to affect lands other than those delineated therein. The purpose of pooling agreements, voluntary or compulsory, is the conservation of the oil and gas resources of the State of Louisiana and the prevention of their waste and depletion. See Jumonville Pipe & Mach. Co., supra. In the case at hand, the record fails to support a manner in which the general conservation aim of the pooling agreement may be furthered by expanding the prescriptive rights beyond the unitized area.
Accordingly, we conclude that the royalty rights of the Central Oil Company Group and the Garth Group on the lands not included in the 320 acre voluntary unit have prescribed because of the failure to drill on, or otherwise use, the remaining acreage beyond the unitized area. Therefore, we hold that liberative prescription extinguished any rights of the Central Oil Company Group in Tracts 8B and 9B of the Laurents Tract and any rights of the Garth Group in Tracts 4B, 4C, 4D, 4E, and 13B of the Macdonell Tract.
DECREE
For the foregoing reasons that portion of the judgment of the trial court recognizing the royalty interests of the Central Oil Company Group and the Garth Group in land not included in the 1956 voluntary unit is reversed. Accordingly, it is ordered, adjudged and decreed that there be judgment in favor of Blanche Laurents Bourque, Yvonne Bourque Craig, Wayne Paul Lau-rents, Jr., and Eugene Webre Laurents (the Laurents Group) and against Central Oil Company, Gulf Oil Corporation, George Schneider, Jr., Kathryn L. Schneider, George Schneider, III, Susan Schneider, and Steven M. Schneider (the Central Oil Company Group) declaring the Laurents Group owner of the total royalty interests in Tracts 8B and 9B, totaling 14.152 acres, located within the Miogypsinoides Sand, Reservoir A Unit, created by Louisiana Department of Conservation Order No. 745-C, dated July 3, 1980, and effective May 20, 1980, shown on the unit survey plat prepared by C. Howard Fenstermaker, dated February 13, 1980, and revised September 24, 1980, a copy of which is annexed to this opinion as Appendix “A”.
*969 It is further ordered, adjudged and decreed that there be judgment in favor of Marshall E. Macdonell, Jr., Robert A. Mac-donell, Esther Snoad Macdonell, Clara Hoag Macdonell, Jeff Davis Bank & Trust Co., Trustee for the Macdonell Trusts for John Philip Macdonell, Jr., Mark Emerson Macdonell and Thomas Lucius Macdonell, John Philip Macdonell, Jr., and Elizabeth Lottinger Macdonell, as Natural Tutrix of Mark Emerson Macdonell and Thomas Lucius Macdonell (the Macdonell Group) and against C.T. Garth, Thomas Garth, Jr., Leta P. Garth, Thomas Garth, Janet J. Garth, Gayle Garth . Daniels, J. Edgar Garth, Cecile T. Garth, James W. Garth, Millane Inc., A.L. Loomis, Jr., Exchange Oil & Gas Corporation, Sherburn M. Becker, Jr., Katherine Q. Gallagher, J.W. Gallagher, Sabine Corporation, Sara R. Hulsey, Sara Hulsey Dinwiddie Dunn, Oliver Grant Dinwiddie, Sara George Dinwiddie, William Gray Dinwiddie, Hibernia National Bank, New Orleans, Louisiana, as Trustee for Winfield H. Perdun, et ux., a revocable Louisiana trust, Maureen A. Deuschel, Henry Deuschel, Marshall A. Jacobs, W.C. English, Jr., Estate of Jessie Lee Worsham, Jr., Charles R. Powell, Tulane Gordon, and Alan A. Hulsey (the Garth Group) declaring the Macdonell Group owners of the total unit royalty interest in Tracts 4B, 4C, 4D, 4E, and 13B, totaling 68.032 acres, located within said Miogypsinoides Sand Unit as shown on Appendix “A” to this opinion. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed against the Central Oil Company Group and the Garth Group.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
*970 [[Image here]]